METRO–GOLDWYN–MAYER
STUDIOS, INC., et al.,
Plaintiffs,

v.

GROKSTER, LTD., et al., Defendants.

Jerry Lieber, et al., Plaintiffs,

v.

Consumer Empowerment BV a/k/a
Fasttrack, et al., Defendants.

And Related Counterclaims

No. CV 01–08541 SVW PJWX,
CV 01–09923 SVW PJWX.

United States District Court,
C.D. California.

April 25, 2003.

See also 243 F.Supp.2d 1073.

Richard H Cooper, Thomas G Hentoff, Beth A Levene, David E Kendall, Robert J Shaughnessy, Nicholas J Boyle, Ana C Reyes, Kevin Hardy, Joseph Marshall Terry, Williams & Connolly, Washington, DC, Matthew J Oppenheim, Dean Garfield, Recording Industry Assoc of America, Washington, DC, Gregory Paul Goeckner, Motion Picture Association of American, Encino, CA, Jan B Norman, Mark D Litvack, Jan B Norman Law Offices, Encino, CA, Jan B Norman, Jan B Norman Law Offices, Los Angeles, CA, Robert M Schwartz, O'Melveny & Myers, Los Angeles, CA, Jessica Davidson Miller, O'Melveny & Myers, Washington, DC, Laura H Parsky, U.S. Department of Justice, Criminal Div, Washington, DC, Mark A Snyder, O'Melveny & Myers, Russell J Frackman, George M Borkowski, Mitchell Silberberg & Knupp, Los Angeles, Steven B Fabrizio, Mitchell Silberberg & Knupp, Washington, DC, for plaintiffs.

Michael H Page, Mark A Lemley, Stacey L Wexler, Keker & Van Nest, San Francisco, CA, Jennifer Stisa Granick, Stanford Law School, Crown Quadrangle, Stanford, CA, for Grokster Ltd., defendant.

Andrew P Bridges, Richard Nessary, Terri Yuh–Lin Chen, Jennifer A Golinveaux, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Debra E Pole, Sidley Austin Brown & Wood, Los Angeles, CA, Joseph R Taylor, Jeffrey K Compton, Liner Yankelevitz Sunshine & Regenstreif, Los Angeles, CA, Charles S Baker, Munsch Hardt Kopf & Harr, Austin, TX, for Musiccity.com, Inc., Musiccity Networks Inc., defendants.

Kenneth B Wilson, Judith Bond Jennison, Kurt B Opsahl, Stefani E Shanberg, Perkins Coie, San Francisco, CA, for Consumer Empowerment BV, defendant.

ORDER GRANTING DEFENDANTS GROKSTER, LTD.'S AND STREAMCAST NETWORKS, INC.'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO DEFENDANTS GROKSTER, LTD. AND STREAMCAST NETWORKS, INC.

WILSON, District Judge.

## I. INTRODUCTION

Plaintiffs bring these actions for copyright infringement under 17 U.S.C. §§ 501, et seq. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs[1] and Defendants StreamCast Networks, Inc. and Grokster, Ltd. ("Defendants") filed cross-motions for summary judgment with regard to contributory and vicarious infringement. Plaintiffs contend that Defendants' conduct renders them liable for copyright infringement committed by users of Defendants' software. Defendants argue, however, that they merely provide software to users over whom they have no control, and thus that no liability may accrue to them under copyright law.

Both parties believe that there are no disputed issues of fact material to Defendants' liability, and thus that there are no factual disputes requiring a trial. Instead, both sides maintain that the only question before the Court (as to liability) is a legal one: whether Defendants' materially undisputed conduct gives rise to copyright liability.

For the reasons stated herein, the Court GRANTS Defendants' Motions for Summary Judgment and DENIES Plaintiffs' Motion for Summary Judgment with respect to Defendants Grokster and StreamCast.

## II. FACTUAL/PROCEDURAL BACKGROUND

### A. General Background

These cases arise from the free exchange of copyrighted music, movies and other digital media over the Internet. When the actions were originally filed, Defendants Grokster, Ltd. ("Grokster"), StreamCast Networks, Inc. (formerly known as MusicCity Networks, Inc.) ("StreamCast"), and Kazaa BV (formerly known as Consumer Empowerment BV) ("Kazaa BV"), distributed software that enabled users to exchange digital media via a peer-to-peer transfer network. In the *Metro–Goldwyn–Mayer v. Grokster* case, CV–01–8541, Plaintiffs are organizations in the motion picture and music recording industries, and bring this action against Defendants for copyright infringement, pursuant to 17 U.S.C. §§ 501, et seq. In the *Lieber v. Consumer Empowerment* case, CV–01–9923, Plaintiffs are professional songwriters and music publishers bringing a class action against the same

---

1. Plaintiffs in the *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.* case, CV 01–8541, consist of two groups: 1) the "Motion Picture Studio Plaintiffs": Metro–Goldwyn–Mayer Studios, Inc.; Columbia Pictures Industries, Inc.; Disney Enterprises, Inc.; New Line Cinema Corp.; Paramount Pictures Corp.; Time Warner Entertainment; Twentieth Century Fox Film Corp.; and Universal City Studios, Inc.; and, 2) the "Record Company Plaintiffs": Arista Records, Inc.; Atlantic Recording Corp.; Rhino Entertainment; Bad Boy Records; Capitol Records; Elektra Entertain-

ment; Hollywood Records, Inc.; Interscope Records; LaFace Records; London–Sire Records; Motown Record Co., LP; BMG Entertainment; Sony Music Entertainment, Inc.; UMG Recordings, Inc.; Virgin Records America, Inc.; Walt Disney Records; Warner Brothers Records, Inc.; WEA International, Inc.; WEA Latina, Inc.; and Zomba Recording Corp.

Plaintiffs in the *Lieber v. Consumer Empowerment BV* case, CV 01–9923, the "Music Publisher Plaintiffs," are a class of professional songwriters and music publishers.

Defendants for copyright infringement, although their Complaint lists separate causes of action for contributory infringement and vicarious infringement. The cases have been consolidated for discovery and pretrial purposes.

Each Defendant distributes free software, which users can download free of charge. Although Grokster, StreamCast and Kazaa BV independently branded, marketed and distributed their respective software, all three platforms initially were powered by the same FastTrack networking technology. The FastTrack technology was developed by Defendants Niklas Zennström and Janus Friis, who also launched Kazaa BV.[2] FastTrack was then licensed to Kazaa BV, Grokster and StreamCast for use in each company's file-sharing software. As a result, users of these software platforms essentially were connected to the same peer-to-peer network and were able to exchange files seamlessly.

However, StreamCast no longer uses the FastTrack technology. Rather, StreamCast now employs the "open" (i.e., not proprietary) Gnutella technology, and distributes its own software—Morpheus—instead of a branded version of the Kazaa Media Desktop. Grokster, meanwhile, continues to distribute a branded version of the Kazaa Media Desktop, which operates on the same FastTrack technology as the Sharman/Kazaa software.

### B. *Operation of the StreamCast (Morpheus) and Grokster Software*

Although novel in important respects, both the Grokster and Morpheus platforms operate in a manner conceptually analogous to the Napster system described at length by the district court in *A & M Records, Inc. v. Napster, Inc.,* 114 F.Supp.2d 896 (N.D.Cal.2000).

In both cases, the software can be transferred to the user's computer, or "downloaded," from servers operated by Defendants. Once installed, a user may elect to "share" certain files located on the user's computer, including, for instance, music files, video files, software applications, e-books and text files. When launched on the user's computer, the software automatically connects to a peer-to-peer network (FastTrack in Grokster's case; Gnutella in the case of Morpheus), and makes any shared files available for transfer to any other user currently connected to the same peer-to-peer network.

Both the Morpheus and Grokster software provide a range of means through which a user may search through the respective pool of shared files. For instance, a user can select to search only among audio files, and then enter a keyword, title, or artist search. Once a search commences, the software displays a list (or partial list) of users who are currently sharing files that match the search criteria, including data such as the estimated time required to transfer each file.

The user may then click on a specific listing to initiate a direct transfer from the source computer to the requesting user's computer. When the transfer is complete, the requesting user and source user have identical copies of the file, and the requesting user may also start sharing the file with others. Multiple transfers to other

---

2. Since this case was originally filed, the operation of the "Kazaa system" has passed from Kazaa BV to Defendant Sharman Networks. In addition, Kazaa BV has apparently ceased defending this action. Because Kazaa BV has failed to defend this action, the Court will enter default against Defendant Kazaa BV (an Order regarding the entry of default will issue separately). The remainder of this Order relates only to Plaintiffs' claims against Defendants Grokster and StreamCast.

users ("uploads"), or from other users ("downloads"), may occur simultaneously to and from a single user's computer.

Both platforms include other incidental features, such as facilities for organizing, viewing and playing media files, and for communicating with other users.

### C. *Limitations of this Order*

Because Plaintiffs principally seek prospective injunctive relief, the Court at this time considers only whether the *current versions* of Grokster's and StreamCast's products and services subject either party to liability. This Order does not reach the question whether either Defendant is liable for damages arising from *past* versions of their software, or from other past activities.

Additionally, it is important to reiterate that the instant motions concern *only* the software operated by Defendants Stream-Cast (the Morpheus software) and Grokster (the Grokster software). Defendant Sharman Networks, proprietor of the Kazaa.com website and Kazaa Media Desktop, is *not* a party to these Motions. Accordingly, the Court offers no opinion in this Order as to Sharman's potential liability.

## III. SUMMARY JUDGMENT STANDARD

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.1997). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

When deciding cross-motions for summary judgment, a district court retains the responsibility to examine the record to ensure that no disputed issues of fact exist, despite the parties' assurances to that effect. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136–37 (9th Cir.2001); *see Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1038 n. 6 (9th Cir.2000).

However, the Court is not obligated "to scour the record in search of a genuine issue of triable fact. [The Court] rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (citations and internal quotation marks omitted). Furthermore, only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party—"over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001) (the nonmoving party must offer specific evidence from which a reasonable jury could return a verdict in its favor).

## IV. DISCUSSION

■ Plaintiffs argue that Defendants are liable for both contributory and vicarious copyright infringement. As a threshold matter, in order to find either contributory or vicarious infringement liability, Plaintiffs must demonstrate that Defendants' end-users are themselves engaged in direct copyright infringement. *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 n. 2 (9th Cir.2001) (*"Napster"*) (citation omitted) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.").

### A. *Direct Infringement*

■ To establish a prima facie case of copyright infringement, Plaintiffs must show: (1) copyright ownership of the allegedly infringing material, and (2) unauthorized copying of the work that is the original. *Id.* at 1013 (citations omitted). With regard to the second prong, "[Plaintiffs] must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *Id.*

With regard to copyright ownership, Defendants, along with the Record Company and Motion Picture Studio Plaintiffs, have stipulated for purposes of these Motions that the sound recordings referenced in the First Amended Complaint are owned by each Plaintiff asserting ownership. (*See* Lapple Decl., Ex. 10; MGM Plaintiffs'

First Amended Complaint ("FAC"), Exs. A and B (list of sound recordings)).

While the Music Publisher Plaintiffs have refused to join in the stipulation, the Court assumes that Plaintiffs could establish ownership or control of at least some of the copyrights listed in their Second Supplemental Rule 26 Disclosures.[3] (*See* Breen Decl. ¶ 7 & Ex. A; Dozier Decl. ¶¶ 8, 10 & Exs. A–B; Stoller Decl. ¶¶ 17–21 & Exs. B–F; Lieber Decl. ¶ 3; Jaegerman Decl. ¶¶ 5–7 & Exs. A–E; Goldsen Decl. ¶ 4 & Exs. A–E; I. Robinson Decl. ¶¶ 6–8 & Exs. A–E.)

Furthermore, it is undisputed that at least some of the individuals who use Defendants' software are engaged in direct copyright infringement of Plaintiffs' copyrighted works. In *Napster,* the Ninth Circuit explained: "[T]he evidence establishes that a majority of Napster users use the service to download and upload copyrighted music.... And by doing that, it constitutes—the uses constitute direct infringement of plaintiffs' musical compositions, recordings." *Napster,* 239 F.3d at 1013–14 (quoting transcript from district court proceedings) (internal quotation marks omitted).

Just as in *Napster,* many of those who use Defendants' software do so to download copyrighted media files, including those owned by Plaintiffs, (*see, e.g.,* Pls.' Statement of Uncontroverted Facts ("Pls.' SUF")) 3(j), 3(t); Griffin Depo. 278:5–10 and Ex. 291), and thereby infringe Plain-

---

3. The Court notes that this issue is moot in light of the Court's ruling.

Additionally, because the Music Publisher Plaintiffs did not stipulate to the ownership of the copyrights in question, Defendant StreamCast filed a Rule 56(f) motion requesting further discovery regarding the Music Publisher Plaintiffs' ownership of the copyrights in question. *See* Fed.R.Civ.P. 56(f). While StreamCast contends that with further discovery, the evidence will show that the Music

Publisher Plaintiffs do not actually own or control several of the copyrights in question, ownership of at least some of the copyrights is not disputed. Thus, this allegedly disputed fact does not affect the Cross–Motions for Summary Judgment, but would have been relevant in a later phase of the litigation. However, this Motion also is moot in light of the Court's ruling. Accordingly, the Court DENIES Defendant Streamcast's Rule 56(f) Motion.

tiffs' rights of reproduction and distribution. *See Napster*, 239 F.3d at 1014 (citations omitted). Thus, for purposes of these motions, Plaintiffs have established direct infringement of their copyrighted works by some end-users of Defendants' software.[4]

### B. *Contributory Infringement*

■ Under the doctrine of contributory copyright infringement, one is liable for contributory infringement if "with knowledge of the infringing activity, [he/she] induces, causes or materially contributes to the infringing conduct of another[.]" *Napster*, 239 F.3d at 1019 (citations and internal quotation marks omitted).

There are two factors that come into play in determining liability for contributory infringement: (1) knowledge, and (2) material contribution. The secondary infringer must "know, or have reason to know of [the] direct infringement." *Adobe Systems Inc. v. Canus Prods., Inc.*, 173 F.Supp.2d 1044, 1048 (C.D.Cal.2001) (citations and internal quotation marks omitted). Furthermore, with regard to the second element, "liability [for contributory infringement] exists if the defendant engages in personal conduct that encourages or assists the infringement." *Napster*, 239 F.3d at 1019 (citation and internal quotation marks omitted).

### 1. Knowledge of Infringing Activity

■ In order to be held liable for contributory infringement, the secondary infringer must know or have reason to know of the direct infringement. *See Napster*, 239 F.3d at 1020. Evidence of actual knowledge of *specific acts* of infringement is required for contributory infringement liability. *Id.* at 1021.

In *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), sale of video cassette recorders ("VCR"s) did not subject Sony to contributory copyright liability, even though Sony knew as a general matter that the machines could be used, and were being used, to infringe the plaintiffs' copyrighted works. Because video tape recorders were capable of both infringing and "substantial noninfringing uses," generic or "constructive" knowledge of infringing activity was insufficient to warrant liability based on the mere retail of Sony's products. *See id.* at 442, 104 S.Ct. 774. "[T]he sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement" if the product is "capable of substantial noninfringing uses." *Id.*

■ Here, it is undisputed that there are substantial noninfringing uses for Defendants' software—e.g., distributing movie trailers, free songs or other non-copyrighted works; using the software in countries where it is legal; or sharing the works of Shakespeare. (*See* Ian Decl. ¶¶ 11–13; Newby Decl. ¶ 12; Prelinger Decl. ¶¶ 11–18; Kahle Decl. ¶¶ 14–20; Mayers Decl. ¶¶ 5–8, 11, 14–17; Sinnreich Decl. ¶¶ 1–6; Busher Decl. ¶¶ 8–34; Hoekman Decl. ¶¶ 3–9.) For instance, StreamCast has adduced evidence that the Morpheus program is regularly used to facilitate and search for public domain materials, government documents, media content for which distribution is authorized, media content as to which the rights owners do not object to distribution, and computer software for which distribution is permitted. (*See* Newby Decl. ¶ 12; Prelinger Decl. ¶¶ 11–18; Kahle Decl. ¶¶ 14–

---

4. Defendants argue that Plaintiffs should not be able to sue for copyright infringement because they misuse their copyrights by violating U.S. antitrust laws. Because the Court denies Plaintiffs' Motion for Summary Judgment, *see infra*, the Court does not reach the issue of copyright misuse.

20; Hoekman Decl. ¶¶ 3–4, 5–7, 8, 9; Ian Decl. ¶¶ 11–13; Sinnreich Decl. ¶¶ 8–24, 33, 34; Mayers Decl. ¶¶ 5–7, 14–17; Busher Decl. ¶¶ 1–12.) The same is true of Grokster's software. (*See, e.g.,* Mayers Decl. ¶¶ 6–7; Pls.' Ex. 34 (D. Rung Depo. Ex. 7) at 3562–64 (describing Grokster's partnership with GigAmerica, a company which claimed to host music from 6,000 independent bands and musicians as of May 2002).)

Furthermore, as the Supreme Court has explained, the existence of substantial noninfringing uses turns not only on a product's *current* uses, but also on potential *future* noninfringing uses. *See Sony,* 464 U.S. at 442, 104 S.Ct. 774; *see also Napster,* 239 F.3d at 1020–21. Plaintiffs do not dispute that Defendants' software is being used, and could be used, for substantial noninfringing purposes.

In light of *Sony,* the Ninth Circuit in *Napster* refused to "impute the requisite level of knowledge to Napster merely because peer-to-peer file-sharing technology may be used to infringe plaintiffs' copyrights." 239 F.3d at 1020–21. Just as Sony could not be held liable for contributory infringement simply because it sold video tape recorders that could be used unlawfully, Napster would not be liable simply because it distributed software that could be used to infringe copyrights. "[A]bsent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material." *Napster,* 239 F.3d at 1021 (citing *Sony,* 464 U.S. at 436, 442–43, 104 S.Ct. 774).

Rather, liability for contributory infringement accrues where a defendant has actual—not merely constructive—knowledge of the infringement at a time during which the defendant materially contributes to that infringement. *See Napster,* 239 F.3d at 1020–22.

In other words, as the Ninth Circuit explained, defendants are liable for contributory infringement only if they (1) have specific knowledge of infringement at a time at which they contribute to the infringement, and (2) fail to act upon that information. *See Napster,* 239 F.3d at 1021 (citation omitted) ("We agree that if a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement.").

With respect to Napster's "actual knowledge" of infringement, the court cited: (1) a document authored by one of Napster's founders mentioning "the need to remain ignorant of users' real names and IP addresses 'since they are exchanging pirated music'"; and (2) the fact that the Recording Industry Association of America notified Napster of more than 12,000 infringing files on its system, some of which were still available. *Id.* at 1020, n. 5 (citation and internal quotation marks omitted).

In this case, Plaintiffs point to a massive volume of similar evidence, including documents suggesting that both Defendants marketed themselves as "the next Napster," that various searches were performed by Defendants' executives for copyrighted song titles or artists, that various internal documents reveal Defendants were aware that their users were infringing copyrights, and that Plaintiffs sent Defendants thousands of notices regarding alleged infringement. (*See, e.g.,* Hardison Depo. 173:8–20 & Ex. 129; Creighton Decl. ¶¶ 19–20 & Exs. 10–17; Charlesworth Decl. ¶¶ 4–19 & Exs. A–P; Breen Decl. ¶¶ 5–10 & Ex. A; Weiss Depo. 126:19–127:22; Kleinrock Decl. ¶¶ 23–28; D. Rung Depo. 221:5–222:8; M. Rung Depo. 31:10–17, 73:3–74:17; Weiss Depo.

89:23–91:6; Kallman Depo. 78:19–79:1; Weiss Depo. 85:12–18, 217:7–221:12; 227:8–233:1,234:18–235:19, 329:13–331:23, 595:12–596:3 & Ex. 24; Hardison Depo. 87:1–15; 122:8–21; 170:17–171:3 & Exs. 110, 115 & 129; Borkowski Decl. Ex. 31; Griffin Depo. 157:7–12; 159:2–17; 161:5–162:10 & Ex. 260; J. Tung Depo. 75:13–77:25; Bodenstein Decl. ¶ 3 & Exs. 1–7.) In other words, Defendants clearly know that many if not most of those individuals who download their software subsequently use it to infringe copyrights.

■ However, Defendants correctly point out that in order to be liable under a theory of contributory infringement, they must have actual knowledge of infringement at a time when they can use that knowledge to stop the particular infringement. In other words, Plaintiffs' notices of infringing conduct are irrelevant if they arrive when Defendants do nothing to facilitate, and cannot do anything to stop, the alleged infringement.

This distinction is illustrated by *Religious Tech. Center v. Netcom On–Line Communication Servs., Inc.*, 907 F.Supp. 1361 (N.D.Cal.1995) (*"Netcom"*), a case informing the Ninth Circuit decision in *Napster*. The *Netcom* court distinguished a line of cases cited by the plaintiff, which concerned a landlord's liability for contributory infringement in the landlord-tenant context. These cases held "that there is no contributory infringement by the lessors of premises that are later used for infringement unless the lessor had knowledge of the intended use at the time of the signing of the lease." *Id.* at 1373 (citation and footnote omitted).

In other words, once the lease is signed, the landlord has no control over his/her tenant's use of the premises for infringing activities. Thus, any knowledge of the infringement that the landlord acquires after the tenant is in control is insufficient to establish contributory infringement liability, because there is nothing the landlord does to facilitate the infringement, or could do to stop it. In contrast, the *Netcom* court explained that "Netcom not only leases space but also serves as an access provider, which includes the storage and transmission of information necessary to facilitate [the end user's] postings to [an Internet newsgroup]. Unlike a landlord, Netcom retains some control over[ ] the use of its system." *Id.* at 1373–74.

It was critical to the court that the allegedly infringing messages were transmitted to Netcom, briefly resided on servers controlled by Netcom, and then were distributed by Netcom to other Internet systems. *See id.* "With an easy software modification Netcom could identify postings that contain particular words or come from particular individuals[,]" and delete those postings from its system (thereby preventing their propagation). *Id.* at 1376. Furthermore, Netcom was able to suspend user accounts—as it had done on at least 1,000 occasions—and preclude any access and distribution by a particular user through Netcom servers. *Id.*

Accordingly, the relevant time frame for purposes of assessing contributory infringement covered the entire "relationship" between Netcom and its users. Thus, the contributory infringement claim was to be decided not based on Netcom's knowledge at the time it entered into the relevant user agreement, but rather based on any knowledge acquired or possessed while Netcom contributed to the alleged infringement—i.e., "when Netcom provided its services to allow [the end user] to infringe plaintiffs' copyrights." *Id.* at 1374 (citation omitted). The *Netcom* court denied summary judgment because there was "a genuine issue as to whether Netcom knew of any infringement [ ] before it was too late to do anything about it." *Id.*

Here, it is undisputed that Defendants are generally aware that many of their users employ Defendants' software to infringe copyrighted works. (*See, e.g.,* Grokster's Mot. at 15 ("[Grokster] is of course aware as a general matter that some of its users are infringing copyrights.").) The question, however, is whether *actual knowledge of specific infringement* accrues at a time when either Defendant materially contributes to the alleged infringement, and can therefore do something about it.

### 2. Material Contribution to the Infringing Activity of Another

As noted *supra*, "liability [for contributory infringement] exists if the defendant engages in personal conduct that encourages or assists the infringement." *Napster*, 239 F.3d at 1019 (citation and internal quotation marks omitted). To be liable for contributory infringement, Defendants must "materially contribute[ ]" to the infringing activity. *Id.* (citations and internal quotation marks omitted).

The original formulation of this doctrine "stems from the notion that one who *directly contributes* to another's infringement should be held accountable." *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir.1996) (emphasis added) (citations omitted). Traditionally, one is liable for contributory infringement if, "with knowledge of the infringing activity, [he or she] induces, causes or materially contributes to the infringing conduct of another[.]" *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971) (cited by *Fonovisa,* 76 F.3d at 264). The Ninth Circuit concluded in *Napster* that "liability exists if the defendant engages in personal conduct that encourages or assists the infringement." 239 F.3d at 1019 (citation and internal quotation marks omitted).

In concluding that Napster materially contributed to the infringement, the Ninth Circuit relied on the district court's finding that "without the support services defendant provides, Napster users could not find and download the music they want with the ease of which defendant boasts." *Napster,* 239 F.3d at 1022 (quoting *A & M Records, Inc. v. Napster,* 114 F.Supp.2d at 919–20) (internal quotation marks omitted).

The district court explained that "Napster is an integrated service designed to enable users to locate and download MP3 music files." *A & M Records v. Napster,* 114 F.Supp.2d at 920. Furthermore, the Ninth Circuit agreed with the district court that because Napster provided the "site and facilities" for direct infringement, Napster materially contributed to the infringement. *Napster,* 239 F.3d at 1022.

In reaching this conclusion, the *Napster* court followed the reasoning of *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, an earlier Ninth Circuit case. In *Fonovisa,* the defendant operated a swap meet where many of the vendors sold counterfeit goods. *Id.* at 260. In concluding that the plaintiff's allegations supported its claim for contributory infringement against the defendant swap meet operator, the court found significant that the defendant did more than provide the space for vendors to sell their goods. The defendant provided other services—utilities, parking, advertising, plumbing, customers—which enabled the infringement to occur in large quantities. *Id.* at 264.

The court further explained that the defendant did not have to directly promote the infringing products to be held liable—it was enough that the defendant provided "the site and facilities for known infringing activity[.]" *Id.* While the defendant attempted to persuade the court that it provided rental space alone, the court explained that the defendant swap meet operator "actively str[ove] to provide the en-

vironment and the market for counterfeit sales to thrive. Its participation in the sales cannot be termed 'passive,' as [the defendant] would prefer." *Id.*

While Napster provided its software free of charge, the district court explained, and the Ninth Circuit agreed, that Napster was no different than the swap meet operator in *Fonovisa*—"The swap meet provided services like parking, booth space, advertising, and clientele. [Citation.] Here, Napster, Inc. supplies the proprietary software, search engine, servers, and means of establishing a connection between users' computers." *A & M Records v. Napster*, 114 F.Supp.2d at 920; *see also Napster*, 239 F.3d at 1022 ("The district court correctly applied the reasoning from *Fonovisa*, and properly found that Napster materially contributes to direct infringement.").

Furthermore, in addition to the software, Napster provided a network—the "site and facilities" for the infringement to take place. Napster hosted a central list of the files available on each user's computer, and thus served as the axis of the file-sharing network's wheel. When Napster closed down, the Napster file-sharing network disappeared with it.

As noted *supra*, the court in *Netcom* reached similar conclusions. Netcom was distinct from a landlord because it was also an "access provider," and because it stored and transmitted the allegedly infringing newsgroup posts at issue in the case. *Netcom*, 907 F.Supp. at 1373–74. Netcom's services were "necessary to facilitate" the infringing postings of which Netcom allegedly had been notified. *Id.* If Plaintiffs could prove Netcom's knowledge of these postings, Netcom would be liable "for contributory infringement since its failure to simply cancel [the end user's] infringing message and thereby stop an infringing copy from being distributed worldwide constitutes substantial participation in [the end user's] public distribution of the mes-

sage." *Id.* at 1374 (citation omitted) (quoted in *Napster*, 239 F.3d at 1022).

Thus, here, the critical question is whether Grokster and StreamCast do anything, aside from distributing software, to actively facilitate—or whether they could do anything to stop—their users' infringing activity.

Plaintiffs argue that Defendants, like Napster, do much to facilitate the actual exchange of copyrighted files, and thus materially contribute to the infringement. In their original Motion, Plaintiffs—who lumped together the activities of Grokster and StreamCast with those of Kazaa BV—asserted that these Defendants provide the "means, environment, and support ... that enable users to ... locate, distribute and copy" copyrighted works. (Pls.'s MSJ at 21.)

As Plaintiffs' own Proposed Statement of Uncontroverted Facts reflects, however, the facts are somewhat distinct—though materially undisputed—with respect to each Defendant.

#### a. Grokster

Grokster currently distributes a branded version of the Kazaa Media Desktop, originally licensed by Consumer Empowerment BV (and now controlled by Sharman). (*See* D. Rung Decl. ¶ 3.) Grokster does not have access to the source code for the application, and cannot alter it in any way. (D. Rung Decl. ¶ 3.) Grokster's primary ability to affect its users' experience derives from its ability to configure a "start page" and provide advertising automatically retrieved by the Grokster client software. (D. Rung Decl. ¶ 3.)

Grokster does not operate a centralized file-sharing network like that seen in *Napster*. Rather, the Grokster-licensed Kazaa Media Desktop software employs Fast-Track networking technology, which is li-

censed by Sharman and is not owned by Grokster.

One of the central features distinguishing FastTrack-based software from other peer-to-peer technology is the dynamic, or variable use of "supernodes." A "node" is an end-point on the Internet, typically a user's computer. A "supernode" is a node that has a heightened function, accumulating information from numerous other nodes. (Smith Opp. Decl. ¶¶ 70–71.) An individual node using FastTrack-based software automatically self-selects its own supernode status; a user's node may be a supernode one day and not on the following day, depending on resource needs and availability of the network.[5] (Smith Opp. Decl. ¶ 72.)

This creates a two-tiered organizational structure, with groups of nodes clustered around a single supernode. When a user starts his/her software, the user's computer finds a supernode and accesses the network. The process of locating a supernode has varied over time. The undisputed evidence is that the Grokster software is preset with a list of "root supernodes," each of which functions principally to connect users to the network by directing them to active supernodes.

5. It is unclear whether or to what extent entities other than Grokster can control this process or other aspects of the FastTrack network, but there is no evidence—and Plaintiffs do not argue—that Defendants have any such role.

6. While it appears that the primary root supernodes on the FastTrack network have been and are operated by Kazaa BV/Sharman, it is not alleged that Grokster operates these supernodes.

7. The initial version of FastTrack licensed to Grokster did obligate Grokster to operate a registration server. (*Id.* at ¶ 7.) A new user was required to register a unique username and e-mail address, and each subsequent use of the Grokster software verified this information against the Grokster registration server.

While Grokster may briefly have had some control over a root supernode, Plaintiffs do not dispute that Grokster no longer operates such a supernode.[6] Thus, the technical process of locating and connecting to a supernode—and the FastTrack network—currently occurs essentially independently of Defendant Grokster.[7]

Once a user is connected to the network, his/her search queries and results are relayed among supernodes, maximizing the breadth of the search pool and minimizing redundancy in search traffic. This also reflects a critical distinction from Napster. Napster utilized, in effect, a single "supernode" owned and operated by Napster. The company's central servers indexed files from, and passed search queries and results among, all Napster users. All Napster search traffic went through, and relied upon, Napster.

When users search for and initiate transfers of files using the Grokster client, they do so without any information being transmitted to or through any computers owned or controlled by Grokster. (*Id.* at ¶ 6.)

(*Id.*) If during a subsequent use the username was blocked or removed, the user would be unable to use certain functions (such as instant messaging), though the file-sharing functions remained operative. (*Id.; see also* Kleinrock Dep. 211:2–12, Page Decl. Ex. M.) Accordingly, operation of the registration server did not provide a means for controlling either access to the network or file-sharing. Furthermore, the FastTrack software has been modified such that it no longer requires a registration database, thereby denying Grokster this role in controlling access to the FastTrack network. (*Id.* at ¶ 8.) Although Grokster continues to operate a voluntary registration server, the server is not integral to a user's network access—it can essentially be bypassed merely by registering a new username and password.

### b. StreamCast

Certain versions of StreamCast's Morpheus product prior to March 2002 were, like Grokster today, based on the Fast-Track technology. However, the current iteration of StreamCast's Morpheus is distinct in important respects from Grokster's software. First, Morpheus is now a proprietary program owned and controlled exclusively by StreamCast. In other words, StreamCast, unlike Grokster, has access to the source code for its software, and can modify the software at will. Second, Morpheus is based on the open-source Gnutella peer-to-peer platform and does not employ a proprietary protocol such as FastTrack.

Gnutella is a "true" peer-to-peer network, featuring even more decentralization than FastTrack. A user connects to the Gnutella network (comprised of all users of Gnutella-based software, including not only Morpheus but that distributed by companies such as "LimeWire," "BearShare," "Gnucleus" and others) by contacting another user who is already connected. This initial connection is usually performed automatically after the user's computer contacts one of many publicly available directories of those currently connected to the Gnutella network.[8] (Smith Opp. Decl. ¶¶ 32–33.) Plaintiffs do not dispute that StreamCast does not itself operate any of these directories or compensate those who do for their use by Morpheus users. (*See* Smith Depo. T. 509:15–509:22; 510:18–511:2.)

Instead of using supernodes, search requests on the Gnutella network are passed from user to user until a match is found or the search request expires. (Gribble Opp.

Decl. ¶¶ 27–31.) When a user selects a file, the transfer is initiated directly between the two users. (Gribble Opp. Decl. ¶¶ 32–33.)

### c. Analysis

Plaintiffs appear reluctant to acknowledge a seminal distinction between Grokster/StreamCast and Napster: neither Grokster nor StreamCast provides the "site and facilities" for direct infringement. *Napster*, 239 F.3d at 1022. Neither StreamCast nor Grokster facilitates the exchange of files between users in the way Napster did. Users connect to the respective networks, select which files to share, send and receive searches, and download files, all with no material involvement of Defendants. If either Defendant closed their doors and deactivated all computers within their control, users of their products could continue sharing files with little or no interruption. (*See, e.g.*, Gribble Decl. ¶¶ 7, 13, 18, 21, 23, 27, 32, and 34; D. Rung Decl. ¶ 6.)

In contrast, Napster indexed the files contained on each user's computer, and each and every search request passed through Napster's servers. *Napster*, 239 F.3d at 1012. Napster provided the "site and facilities" for the alleged infringement, *id.* at 1022, affording it perfect knowledge and complete control over the infringing activity of its users. If Napster deactivated its computers, users would no longer be able to share files through the Napster network.

The evidence of contributory infringement cited by Plaintiffs with respect to

---

**8.** These "directories" include both Gnutella clients that transmit IP addresses of other clients ("hostcaches") and websites that host lists of IP addresses for currently-connected computers ("G web caches.") Other methods of connecting to the Gnutella network include manually acquiring (i.e., by word-of-mouth) and inputting the IP address of an individual known to be connected, or querying Internet Relay Chat rooms where lists of active addresses are posted. The current version of Morpheus is preconfigured to query particular hostcaches and G web caches.

these Defendants is not material. For instance, in their Statement of Uncontroverted Facts, Plaintiffs propose the following fact: "Defendants' systems enable, and provide an infrastructure for, users to search for, reproduce and distribute copyrighted sound recordings, motion pictures and other types of works without the authorization of the copyright owner." (Pls.' SUF 4(b)). If established by the record, the fact that Defendants provide an "infrastructure" for file-sharing would be of obvious significance in light of the *Napster* cases.

Plaintiffs, however, present no admissible evidence to create a genuine dispute regarding this fact. Rather, characteristic of the evidence cited are (1) a handful of isolated technical support e-mails from Grokster and StreamCast employees sent in response to users who encountered difficulties playing copyrighted media files;[9] and (2) evidence of previously unmoderated discussion forums in which some Grokster users searched for, and discussed the propriety of exchanging, copyrighted files. (*See* Pls.' SUF 4(b); *see also* Pls.' *SUF* 4(p).)

As an initial matter, the record indicates that Defendants have undertaken efforts to avoid assisting users who seek to use their software for improper purposes. More critically, technical assistance and other incidental services are not "material" to the alleged infringement. To be liable for contributory infringement, "[p]articipation in the infringement must be substantial. The authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer." *Marvullo v. Gruner & Jahr*, 105 F.Supp.2d 225, 230 (S.D.N.Y.

2000) (citation omitted); *accord Arista Records, Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. LEXIS 16165, at *16 (S.D.N.Y. Aug. 28, 2002). Here, the technical assistance was rendered *after* the alleged infringement took place, was routine and non-specific in nature, and, in most cases, related to use of *other companies'* software (e.g., third-party media player software).

The only "technical assistance" that would bear on this analysis would be that which suggests Defendants somehow facilitate or contribute to the actual exchange of files. Plaintiffs cite no such evidence. Indeed, Plaintiffs cite two e-mails to Defendant Grokster in which users complained that copyrighted files they had attempted to download contained computer viruses. (D. Rung Depo. Ex. 64, 66.) In both cases, Grokster responded with a "stock" statement explaining that Grokster has no "control over who uses the system or what is shared through it," and could not block the files. (*Id.*) This, despite the fact that the files at issue were viruses that presumably could have posed a risk to Grokster's users.

Additionally, Plaintiffs allege that Defendants communicate with users (both directly and through information displayed on a web "start page"), and can prompt users to initiate modifications or upgrades to the client software. (*See* Pls.' SUF 4(c), (e), (f), (k).) Even if this is true,[10] it is irrelevant. Whether Defendants can communicate with the users of their software and provide updates says nothing about whether Defendants facilitate or enable the exchange of copyrighted files at issue in these cases.

Finally, in their effort to establish material contribution, Plaintiffs rely in large

---

**9.** None of the e-mails appear to reference any of the copyrighted works to which Plaintiffs have attempted to limit this Motion.

**10.** There is no admissible evidence that establishes, for instance, that Defendant Grokster controls the file-sharing functionality of the software it distributes.

part on a declaration by Leonard Kleinrock, a professor of computer science and pioneer of Internet technology. (*See* SUF 4(a-p); Kleinrock Decl.) However, the cited portions of Prof. Kleinrock's Declaration essentially restate Plaintiffs' undisputed allegations (e.g., that Defendants have, in the *past*, operated centralized file-sharing networks or, in some previous instances, maintained FastTrack supernodes, or that Defendants provide centralized yet incidental services, such as "start pages" and chat rooms). (*See, e.g., id.* ¶ 37.) Additionally, Prof. Kleinrock's conclusion that Defendants "materially facilitate" the alleged infringement, (*see id.* ¶ 3(b)), is in the nature of a legal conclusion and reserved to the Court.

Defendants distribute and support software, the users of which can and do choose to employ it for both lawful and unlawful ends. Grokster and StreamCast are not significantly different from companies that sell home video recorders or copy machines, both of which can be and are used to infringe copyrights. While Defendants, like Sony or Xerox, may know that their products will be used illegally by some (or even many) users, and may provide support services and refinements that indirectly support such use, liability for contributory infringement does not lie "merely because peer-to-peer file-sharing technology may be used to infringe plaintiffs' copyrights." *Napster*, 239 F.3d at 1020–21 (citation omitted). Absent evidence of active and substantial contribution to the infringement itself, Defendants cannot be liable.

Because there are no disputed issues of fact material to this analysis, summary judgment is granted for Defendants.

## C. *Vicarious Infringement*

█ The doctrine of vicarious infringement, an expansion of traditional respondeat superior, extends liability for copyright infringement to "cases in which a defendant 'has a right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" *Napster*, 239 F.3d at 1022 (quoting *Fonovisa*, 76 F.3d at 262 (citation omitted)).

█ There are two elements required for vicarious infringement: (1) financial benefit, and (2) the defendant's right and ability to supervise the infringing conduct. As opposed to contributory infringement, one can be liable for vicarious infringement without knowledge of the infringement. *Adobe Systems*, 173 F.Supp.2d at 1049 (citation omitted) ("Lack of knowledge of the infringement is irrelevant.").

### 1. Financial Benefit

To be liable for vicarious infringement, a defendant must have a "direct financial interest in the infringing activity." *Napster*, 239 F.3d at 1023 (citing *A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 921–22). The Ninth Circuit held in *Fonovisa* that financial benefit may be shown "where infringing performances enhance the attractiveness of the venue to potential customers." 76 F.3d at 263. Further, "[f]inancial benefit exists where the availability of infringing material 'acts as a "draw" for customers.'" *Napster*, 239 F.3d at 1023 (quoting *Fonovisa*, 76 F.3d at 263–64).

Here, it is clear that Defendants derive a financial benefit from the infringing conduct. The ability to trade copyrighted songs and other copyrighted works certainly is a "draw" for many users of Defendants' software. As a result, Defendants have a user base in the tens of millions. (Pls.' SUF 5(a).)

In *Fonovisa*, the court explained: "[T]he defendants reap substantial financial benefits from admission fees, concession stand

sales and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices." 76 F.3d at 263. Just as customers were attracted to the swap meet in *Fonovisa* because of the sale of counterfeit goods, *id.*, individuals are attracted to Defendants' software because of the ability to acquire copyrighted material free of charge.

While those who use Defendants' software do not pay for the product, Defendants derive substantial revenue from advertising. For example, StreamCast had $1.8 million in revenue in 2001 from advertising. (SUF 5(b); Griffin Depo. 446:1–14.) And as of July of 2002, StreamCast had $2 million in revenue and projects $5.7 million by the end of the year. (Griffin Depo. 455:7, 456:2–3.) Grokster also derives substantial revenue from advertising. (D.Rung.Depo.140:21–141:1.) The more individuals who download the software, the more advertising revenue Defendants collect. And because a substantial number of users download the software to acquire copyrighted material, a significant proportion of Defendants' advertising revenue depends upon the infringement. Defendants thus derive a financial benefit from the infringement.[11]

### 2. Right and Ability to Supervise the Infringing Conduct

As noted *supra*, vicarious liability arose from the agency doctrine of respondeat superior. *See Gershwin*, 443 F.2d at 1162. The doctrine ultimately was expanded to include other situations where a defendant has the "right and ability to supervise the infringing activity" of another. *Fonovisa*, 76 F.3d at 262 (citing *Gershwin*, 443 F.2d at 1162).

In *Fonovisa*, the Ninth Circuit held that the plaintiff's complaint alleged sufficient control. 76 F.3d at 263. The court concluded that the defendant swap meet operator had the right to supervise (or "police") the infringing conduct for the following reasons: the defendant had the right to terminate vendors for any reason; the defendant promoted the swap meet; the defendant controlled the access of customers to the booth area; the defendant patrolled the small booth area; the defendant could control direct infringers through its rules and regulations; and the defendant promoted the show. *Id.* at 262–63.

The Ninth Circuit identified similar influence and control in *Napster*. Most notably, Napster had the "right and ability to supervise its users' conduct[,]" including the central indices of files being shared and exchanged. *Napster*, 239 F.3d at 1023 (citing district court opinion). Moreover, Napster users were required to register with Napster, and access to the file-sharing system depended upon a user's valid registration. *Id.* at 1011–12, 1023–24. As a result, Napster possessed—and frequently exercised—the power to terminate access for users who violated company policies or applicable law. *Id.* at 1023. The "ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise" the infringing conduct. *Id.* Together, the centralized search indices and mandatory registration system gave Napster both "knowledge" of what was being exchanged, and an ability to police those exchanges.

Similarly, in a case involving vicarious liability for operation of a peer-to-peer file-sharing network, a district court in Illinois

---

11. This conclusion is essentially undisputed by Defendants. (*See* StreamCast's Memo of P & A in Supp. of Partial Summ. Judgment re: Vic. Infringement; StreamCast's Reply; StreamCast's Opp. to Pl.'s Mot.; Grokster's Memo of P & A in Supp. of MSJ at 16.)

explained that the defendant had "the right and ability to supervise" the infringing conduct because the defendant had the ability to terminate users and control access to the system. *In re: Aimster Copyright Litig.*, 252 F.Supp.2d 634, 654–55 (N.D.Ill.2002).

Defendants argue principally that they do not have the ability to control the infringement as did these other defendants. Because they have no ability to supervise or control the file-sharing networks, or to restrict access to them, Defendants maintain that they cannot police what is being traded as Napster could. Plaintiffs contend, however, that the software itself could be altered to prevent users from sharing copyrighted files. Indeed, Napster was obligated to exercise its "right to police" to the fullest extent, which included implementing new client software filtering mechanisms. *See Napster*, 239 F.3d at 1023–24.

Plaintiffs note that Defendants' software already includes optional screens for pornographic/obscene file names, and that it could just as easily screen out copyrighted song titles. Likewise, they note that the software searches "meta data"—information beyond the filename contained in the file itself, including artist, title, album, etc.—and that an effective "meta data" screen could likewise be implemented quite easily. Finally, Plaintiffs contend that Defendants could with relative ease employ emerging "digital fingerprinting" technology that would block out a substantial percentage of copyrighted songs. Defendants dispute the feasibility and efficacy of these remedies.

However, whether these safeguards are practicable is immaterial to this analysis, as the obligation to "police" arises only where a defendant has the "right and ability" to supervise *the infringing conduct. See Napster*, 239 F.3d at 1023; *Fonovisa*, 76 F.3d at 262. Plaintiffs' argument—that

Defendants could do more to limit the functionality of their software with respect to copyrighted works—forgets the critical distinction, broached above, between the Napster "system" and the software distributed by Defendants.

The infringement in *Napster* took place across an "integrated service" designed and operated by Napster. *See Napster*, 239 F.3d at 1022 (quoting district court). Napster possessed the ability to monitor and control its network, and routinely exercised its ability to exclude particular users from it. *See id.* In a virtual sense, the "premises" of the infringement were the Napster network itself, and Napster had a duty to exercise its reserved right and ability to police those premises to the fullest extent possible. The client software was an essential component of the integrated Napster system, and Napster's obligation to police necessarily extended to the client software itself.

Such is not the case here. Defendants provide software that communicates across networks that are entirely outside Defendants control. In the case of Grokster, the network is the propriety FastTrack network, which is clearly not controlled by Defendant Grokster. In the case of StreamCast, the network is Gnutella, the open-source nature of which apparently places it outside the control of *any* single entity.

While the parties dispute what Defendants feasibly could do to alter their software, here, unlike in *Napster*, there is no admissible evidence before the Court indicating that Defendants have the ability to supervise and control the infringing conduct (all of which occurs *after* the product has passed to end-users). The doctrine of vicarious infringement does not contemplate liability based upon the fact that a product could be made such that it is less

susceptible to unlawful use, where no control over the *user* of the product exists.

Accordingly, there are no genuine issues of fact material to this claim, and summary judgment is appropriate.

## V. CONCLUSION

The Court is not blind to the possibility that Defendants may have intentionally structured their businesses to avoid secondary liability for copyright infringement, while benefitting financially from the illicit draw of their wares. While the Court need not decide whether steps could be taken to reduce the susceptibility of such software to unlawful use, assuming such steps could be taken, additional legislative guidance may be well-counseled.

To justify a judicial remedy, however, Plaintiffs invite this Court to expand existing copyright law beyond its well-drawn boundaries. As the Supreme Court has observed, courts must tread lightly in circumstances such as these:

> The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme. [Citations.] Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the raised permutations of competing interests that are inevitably implicated by such new technology.
>
> In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never calculated such a calculus of interests.

*Sony,* 464 U.S. at 431, 104 S.Ct. 774 (citations omitted); *accord Teleprompter Corp. v. Columbia Broadcasting System, Inc.,*

415 U.S. 394, 414, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974).

Therefore, for the reasons stated, the Court HEREBY GRANTS the following Motions:

1) Defendant Grokster, Ltd.'s Motion for Summary Judgment [132–1];

2) Defendant StreamCast Networks, Inc.'s Motion for Partial Summary Judgment Re: Contributory Infringement [140–1]; and

3) Defendant StreamCast Networks, Inc.'s Motion for Partial Summary Judgment Re: Vicarious Infringement [142–1].

The Court HEREBY DENIES Plaintiffs' Motion for Summary Judgment [146–1], with respect to Defendants Grokster, Ltd. and StreamCast Networks, Inc. only. In addition, the Court HEREBY DENIES AS MOOT Defendant StreamCast Networks, Inc.'s Rule 56(f) Motion [322–1].

IT IS SO ORDERED.