Harlan ELLISON, Plaintiff–Appellant,

v.

Stephen ROBERTSON, an individual a/k/a Steven Robertson a/k/a Shaker@tco.net, Defendant,

and

America Online Inc., a Corporation, Defendant–Appellee.

No. 02–55797.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 2003.

Filed Feb. 10, 2004.

Glen L. Kulik, John H. Carmichael (brief), and Brigit K. Connelly, of Kulik, Gottesman, and Mouton, LLP, Sherman Oaks, CA, and Charles E. Petit (argued), Law Office of Charles E. Petit, Urbana, IL, for the plaintiff-appellant.

Daniel Scott Schecter (argued) and Belinda S. Lee, Latham & Watkins, Los Angeles, CA, for the defendant-appellee.

Donald B. Verilli, Jr. (argued), Thomas J. Perilli, Kali N. Bracey, and Younjae Lee, Jenner & Block, LLC, Washington, D.C., for amici curiae BMG Music, EMI Recorded Music, Sony Music Entertainment, and Universal Music Group.

Sonya D. Winner, Evan Cox, Daniel Hirsch, Covington & Burling, San Francisco, CA, for amicus curiae Business Software Alliance.

Daniel Schultz, James J. Halpert, and Arthur F. Fergenson, Piper Rudnick, LLP, Los Angeles, CA, for amicus curiae Internet Commerce Coalition and Stewart A. Baker and Alice E. Loughran, Steptoe & Johnson, LLP, Washington, D.C., for amicus curiae U.S. Internet Service Provider Association.

Laura A. Kaster, Frank L. Politano, and Michele A. Farber, AT & T Corp., Bedminster, NJ, for amicus curiae AT & T Corporation.

Bruce G. Joseph and Scott E. Bain, Wiley, Rein, & Fielding, Washington, D.C., for amici curiae Association of American Universities, American Council on Education, and National Association of State Universities and Land–Grant Colleges.

Before PREGERSON, THOMAS, Circuit Judges, and OBERDORFER,[*] Senior District Judge.

PREGERSON, Circuit Judge:

Harlan Ellison appeals the district court's summary judgment dismissal of his copyright infringement action against America Online, Inc. (AOL). The copyright infringement action arose when, without Ellison's authorization, Stephen Robertson posted copies of some of Ellison's copyrighted short stories on a peer-to-peer file sharing network, the USENET.[1] Because AOL provides its subscribers access to the USENET news-group[2] at issue, Ellison brought claims for vicarious and contributory copyright infringement against AOL. AOL moved for summary judgment. It asserted defenses to Ellison's infringement claims and alterna-

tively argued that it qualified for one of the four safe harbor limitations of liability under Title II of the Digital Millennium Copyright Act (DMCA).[3] The district court concluded that AOL was not liable for vicarious infringement. Although the court found there to be triable issues of material fact concerning Ellison's contributory infringement claim, it nonetheless granted summary judgment because it held that AOL qualified for the DMCA safe harbor limitation of liability under 17 U.S.C. § 512(a).

We hold that the district court erred in granting AOL's motion for summary judgment. We affirm the district court's holdings as to vicarious and contributory infringement, but we reverse the district court's application of the safe harbor limitation from liability. There are triable issues of material fact concerning whether AOL meets the threshold requirements, set forth in § 512(i), to assert the safe harbor limitations of liability of §§ 512(a-d). If after remand a jury finds AOL to be eligible under § 512(i) to assert the safe harbor limitations of §§ 512(a-d), the parties need not relitigate whether AOL qualifies for the limitation of liability provided by § 512(a); the district court's resolution of that issue at the summary judgment stage is sound. We affirm in part, reverse in part, and remand.

## Facts and Procedural Background

Harlan Ellison is the author of numerous science fiction novels and short stories,

---

[*] The Honorable Louis F. Oberdorfer, Senior Judge, United States District Court for the District of Columbia, sitting by designation.

1. USENET is an abbreviation of "user network." This term refers to an international collection of organizations and individuals (known as "peers") whose computers connect to one another and exchange messages posted by USENET users. See Ellison v. Robertson, 189 F.Supp.2d 1051, 1053 (C.D.Cal.2002).

2. A news-group is an online forum for USENET users to discuss, read about, or post messages on a particular topic. News-groups are commonly organized around a particular shared interest, such as science fiction or politics. See Religious Tech. Ctr. v. Netcom Online Communication Servs., Inc., 923 F.Supp. 1231, 1239 n. 5 (N.D.Cal.1995).

3. Title II of the DMCA, 17 U.S.C. § 512, is also known as the Online Copyright Infringement Liability Limitation Act (OCILLA).

and he owns valid copyrights to those works. In the spring of 2000, Stephen Robertson electronically scanned and copied a number of Ellison's fictional works to convert them to digital files. Robertson subsequently uploaded the files onto the USENET news-group "alt.binaries.e-book." Robertson accessed the Internet through his local Internet service provider, Tehama County Online, and his USENET service was provided by RemarQ Communities, Inc. The USENET news-group at issue in this case was used primarily to exchange unauthorized digital copies of works by famous authors, including Ellison.

After Robertson made the infringing copies of Ellison's works accessible to the news-group, the works were forwarded and copied throughout the USENET to servers all over the world, including those belonging to AOL. As a result, AOL's subscribers had access to the news-group containing the infringing copies of Ellison's works. At the time Robertson posted the infringing copies of Ellison's works, AOL's policy was to store and retain files attached to USENET postings on the company's servers for fourteen days.

On or about April 13, 2000, Ellison learned of the infringing activity and contacted legal counsel. On April 17, 2000, in compliance with the notification procedures the DMCA requires, Ellison's counsel sent an e-mail message to agents of Tehama County Online and AOL to notify the service providers of the infringing activity. Ellison received an acknowledgment of receipt from Tehama County Online but received nothing from AOL, which claims never to have received the e-mail.

On April 24, 2000, Ellison filed an action against AOL and others in the United States District Court for the Central District of California. Upon receipt of Ellison's complaint, AOL blocked its subscribers' access to the news-group at issue.

AOL thereafter moved for summary judgment, arguing that the undisputed facts did not prove Ellison's copyright infringement claims. AOL alternatively asserted the safe harbor limitations to liability under Title II of the DMCA. On November 27, 2001, Ellison moved for summary judgment of his contributory and vicarious copyright infringement claims against AOL. On March 13, 2002, the district court granted AOL's summary judgment motion and denied Ellison's summary judgment motion. The court found that: (1) the evidence failed to establish Ellison's claims of direct and vicarious copyright infringement; (2) whether AOL was liable for contributory copyright infringement presented a triable issue of fact; (3) the evidence showed that AOL met the threshold eligibility requirements of 17 U.S.C. § 512(i) for the safe harbor limitations from liability under OCILLA (Title II of the DMCA); and (4) AOL *qualified* for the safe harbor limitation on liability under 17 U.S.C. § 512(a). Ellison now appeals.

### Discussion

### I. Jurisdiction and Standard of Review

 We have jurisdiction to hear this appeal under 28 U.S.C. § 1291. We review an order granting summary judgment de novo. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir.2001). For the purposes of summary judgment, the moving party bears the burden of proving the absence of a genuine issue of a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56. A genuine issue of fact is one that could reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. Moreover, in the summary judgment context, we construe all facts in the light most favorable to the non-moving party. *Clicks*, 251 F.3d

at 1257. We review de novo the district court's interpretations of the Copyright Act, 17 U.S.C. § 101, *et seq.* *Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir.2000).

## II. The Law of Copyright Infringement and the DMCA

Ellison alleges that AOL infringed his copyrighted works. As a threshold question, a plaintiff who claims copyright infringement must show: (1) ownership of a valid copyright; and (2) that the defendant violated the copyright owner's exclusive rights under the Copyright Act. 17 U.S.C. § 501(a) (2003); *Ets–Hokin*, 225 F.3d at 1073. We recognize three doctrines of copyright liability: direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement. To prove a claim of direct copyright infringement, a plaintiff must show that he owns the copyright and that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act.[4] *A & M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (*Napster II*). "One who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct *of another* may be liable as a 'contributory' [copyright] infringer." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971) (footnote omitted and emphasis added). We have interpreted the knowledge requirement for contributory copyright infringement to include both those with *actual knowledge* and those who *have reason to know* of direct infringement. *Napster II*, 239 F.3d at 1020. A defendant is vicariously liable for copyright infringement if he enjoys a direct financial benefit from *another's* infringing

activity and "has the right and ability to supervise" the infringing activity. *Napster II*, 239 F.3d at 1022 (quoting *Gershwin Publ'g Corp.*, 443 F.2d at 1162); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir.1996); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.04[A][1] (perm.ed., rev.vol.2003).

Congress enacted the DMCA in 1998 to comply with international copyright treaties and to update domestic copyright law for the online world. *See* Digital Millennium Copyright Act, Pub.L. No. 105–304, 112 Stat. 2860 (1998); 3 *Nimmer on Copyright* § 12A.02[A]; David W. Quinto, *Law of Internet Disputes* § 6.02 (2002). Difficult and controversial questions of copyright liability in the online world prompted Congress to enact Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act (OCILLA). 17 U.S.C. § 512 (2003). OCILLA endeavors to facilitate cooperation among Internet service providers and copyright owners "to detect and deal with copyright infringements that take place in the digital networked environment." S. Rep. 105–190, at 20 (1998); H.R. Rep. 105–551, pt. 2, at 49 (1998). Congress hoped to provide "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." *Id.*

But "[r]ather than embarking on a wholesale clarification of" the various doctrines of copyright liability, Congress opted "to leave current law in its evolving state and, instead, to create a series of 'safe harbors,' for certain common activities of service providers." S. Rep. 105–190, at 19. Under OCILLA's four safe harbors, service providers may limit their liability for claims of copyright infringement. 17 U.S.C. § 512(a-d). These safe

---

**4.** The district court granted AOL's motion for summary judgment with respect to Ellison's claim of direct copyright infringement. *See* *Ellison,* 189 F.Supp.2d at 1056–57. Ellison abandoned his claim for direct infringement on appeal.

harbors provide protection from liability for: (1) transitory digital network communications;[5] (2) system caching;[6] (3) information residing on systems or networks at the direction of users;[7] and (4) information location tools.[8] Far short of adopting enhanced or wholly new standards to evaluate claims of copyright infringement against online service providers, Congress provided that OCILLA's "limitations of liability apply if the provider is found to be liable *under existing principles of law.*" S. Rep. 105–190, at 19 (emphasis added).

We thus agree with the district court that "[t]he DMCA did not simply rewrite copyright law for the on-line world." *Ellison*, 189 F.Supp.2d at 1061. Congress would have done so if it so desired. Claims against service providers for direct, contributory, or vicarious copyright infringement, therefore, are generally evaluated just as they would be in the non-online world.

## III. Ellison's Claims Against AOL

### A. Contributory Copyright Infringement

■ Ellison alleged in his complaint that AOL was contributorily liable for copyright infringement. To substantiate his claim, he must show that AOL knew or had reason to know of the infringing activity taking place on its USENET servers and that AOL materially contributed to the infringing activity.

### 1. Knowledge

We first consider whether AOL knew or had reason to know of the infringing activity. The district court found that AOL did not have actual knowledge of the infringement before Ellison filed his copyright infringement action, but concluded that "a

reasonable trier of fact could certainly find that AOL had reason to know that infringing copies of Ellison's works were stored on their Usenet servers." *Ellison*, 189 F.Supp.2d at 1058. We agree.

AOL changed its contact e-mail address from "copyright@aol.com" to "aolcopyright@aol.com" in the fall of 1999, but waited until April 2000 to register the change with the U.S. Copyright Office. Moreover, AOL failed to configure the old e-mail address so that it would either forward messages to the new address or return new messages to their senders. In the meantime, complaints such as Ellison's went unheeded, and complainants were not notified that their messages had not been delivered. Furthermore, there is evidence in the record suggesting that a phone call from AOL subscriber John J. Miller to AOL should have put AOL on notice of the infringing activity on the particular USENET group at issue in this case, "alt.binaries.e-book." Miller contacted AOL to report the existence of unauthorized copies of works by various authors. Because there is evidence indicating that AOL changed its e-mail address in an unreasonable manner and that AOL should have been on notice of infringing activity we conclude that a reasonable trier of fact could find that AOL had reason to know of potentially infringing activity occurring within its USENET network.

### 2. Material Contribution

The second element a plaintiff must prove to succeed on a claim of contributory copyright infringement is that the defendant materially contributed to another's infringement. *Napster II*, 239 F.3d at 1022. The district court found that Ellison demonstrated a triable issue regarding

---

5. 17 U.S.C. § 512(a).

6. 17 U.S.C. § 512(b).

7. 17 U.S.C. § 512(c).

8. 17 U.S.C. § 512(d).

whether AOL materially contributed to the copyright infringement:

> The Court agrees with the findings of the court in *Netcom* that "[p]roviding a service that allows for the automatic distribution of all Usenet postings, infringing and noninfringing" can constitute a material contribution when the [Internet service provider] knows or should know of infringing activity on its system "yet continues to aid in the accomplishment of . . . [the direct infringer's] purpose of publicly distributing the postings."

*Ellison,* 189 F.Supp.2d at 1059 (quoting *Religious Tech. Ctr. v. Netcom Online Communication Servs., Inc.,* 907 F.Supp. 1361, 1375 (N.D.Cal.1995)); *see also* 3 *Nimmer on Copyright* § 12B.01[A][1] n. 50 (indicating that Netcom's inaction constituted material contribution). In *Netcom,* the copyright holders of certain works of L. Ron Hubbard sued the operator of a news-group and a large Internet service provider, Netcom, for copyright infringement. The *Netcom* court held that the fact that the USENET service allowed Netcom's subscribers access to copyrighted works was sufficient to raise a triable issue regarding material contribution. *Netcom,* 907 F.Supp. at 1375. We conclude that this reasoning applies to Ellison's claim of contributory copyright infringement. Because a reasonable trier of fact could conclude that AOL materially contributed to the copyright infringement by storing infringing copies of Ellison's works on its USENET groups and providing the groups' users with access to those copies, we agree with the district court's finding that this constituted a triable issue.

## B. Vicarious Copyright Infringement

Ellison alleges that AOL is vicariously liable for copyright infringement. Thus, Ellison must show that AOL derived a direct financial benefit from the infringement and had the right and ability to supervise the infringing activity.

"Financial benefit exists where the availability of infringing material 'acts as a "draw" for customers.'" *Napster II,* 239 F.3d at 1023 (quoting *Fonovisa,* 76 F.3d at 263–64). In *Napster II,* we found that Napster increased its userbase by providing its customers with access to pirated copies of protected works and that "[a]mple evidence support[ed] the district court's finding that Napster's future revenue[was] directly dependent upon increases in userbase." *Id.* (quotations omitted). But in this case, the district court sought to distinguish *Napster II.* The district court emphasized that virtually all of Napster's "draw" of customers resulted from Napster's providing access to infringing material. Because AOL's USENET group access constituted a relatively insignificant draw when cast against AOL's vast array of products and services, the district court reasoned, AOL did not receive a direct financial benefit from the infringing activity.[9]

■ The district court interprets *Fonovisa* and "direct financial benefit" to require a "substantial" proportion of a defendant's income to be directly linked to infringing activities for the purpose of vicarious liability analysis. *Ellison,* 189 F.Supp.2d at 1062–64. We disagree with the addition of this quantification requirement. We concluded in *Fonovisa* that "the sale of pirated recordings at the Cherry Auction swap meet is a 'draw' for customers," which we held sufficient to state the financial benefit element of the claim for vicarious liability. *Fonovisa,* 76

---

**9.** *Ellison,* 189 F.Supp.2d at 1062–64 ("Making it easier to exchange infringing copies of music files was Napster's main draw.... By contrast, only a tiny fraction of AOL usage has anything to do with USENET, and only a substantially smaller subset of that usage appears to have anything to do with infringing copyrights.").

F.3d at 263–64. There is no requirement that the draw be "substantial."

AOL offers access to USENET groups as part of its service for a reason: it helps to encourage overall subscription to its services. Here, AOL's future revenue is directly dependent upon increases in its userbase. Certainly, the fact that AOL provides its subscribers access to certain USENET groups constitutes a small "draw" in proportion to its overall profits, but AOL's status as a behemoth online service provider, by itself, does not insulate it categorically from vicarious liability. Regardless of what *fraction* of AOL's earnings are considered a direct result of providing its subscribers access to the USENET groups that contained infringing material—indeed, almost any aspect of AOL's services would appear *relatively* minuscule because of its sheer size—they would be earnings nonetheless. The essential aspect of the "direct financial benefit" inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits.

■ Given this framework, the question before us is whether there is a triable issue of a material fact regarding whether AOL received a direct financial benefit from the copyright infringement. Ellison proffers the following evidence to support his contention that AOL received a direct financial benefit from the infringement: (1) an AOL securities filing that reflects the central importance of attracting and retaining subscribers for its business and revenue generation and (2) evidence indicating that many subscribers inquired about AOL blocking access to the USENET group at issue. This evidence is

hardly compelling. We note that there is no evidence that indicates that AOL customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer available. While a causal relationship might exist between AOL's profits from subscriptions and the infringing activity taking place on its USENET servers, Ellison has not offered enough evidence for a reasonable juror so to conclude.

We recognize, of course, that there is usually substantial overlap between aspects of goods or services that customers value and aspects of goods or services that ultimately draw the customers. There are, however, cases in which customers value a service that does not "act as a draw." Accordingly, Congress cautions courts that "receiving a one-time set-up fee and flat periodic payments for service ... [ordinarily] would not constitute receiving a 'financial benefit directly attributable to the infringing activity.'" S. Rep. 105–190, at 44. But "where the value of the service lies in providing access to infringing material," courts might find such "one-time set-up and flat periodic" fees to constitute a direct financial benefit. *Id.* at 44–45. Thus, the central question of the "direct financial benefit" inquiry in this case is whether the infringing activity constitutes a draw for subscribers, not just an added benefit.

The record lacks evidence that AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement. Accordingly, no jury could reasonably conclude that AOL received a direct financial benefit from providing access to the infringing material. Therefore, Ellison's claim of vicarious copyright infringement fails.[10]

---

**10.** Because Ellison's argument that AOL received a direct financial benefit from the infringement in this case fails, we need not address whether AOL had the right and ability to supervise the infringing activity.

## IV. AOL and the Safe Harbors from Liability Under the DMCA

### A. Threshold Eligibility Under § 512(i) for OCILLA's Safe Harbors

To be eligible for any of the four safe harbor limitations of liability, a service provider must meet the conditions for eligibility set forth in OCILLA. 17 U.S.C. § 512(i). The safe harbor limitations of liability only apply to a service provider that:

(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures.[11]

17 U.S.C. § 512(i)(1). If a service provider does not meet these threshold requirements, it is not entitled to invoke OCILLA's safe harbor limitations on liability. 17 U.S.C. § 512(i)(1).

■ We hold that the district court erred in concluding on summary judgment that AOL satisfied the requirements of § 512(i). There is at least a triable issue of material fact regarding AOL's eligibility for the safe harbor limitations of liability in this case. Section 512(i)(1)(A) requires service providers to: (1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform its subscribers of the policy. It

is difficult to conclude as a matter of law, as the district court did, that AOL had "reasonably implemented" a policy against repeat infringers. There is ample evidence in the record that suggests that AOL did not have an effective notification procedure in place at the time the alleged infringing activities were taking place. Although AOL did notify the Copyright Office of its correct e-mail address before Ellison's attorney attempted to contact AOL and did post its correct e-mail address on the AOL website with a brief summary of its policy as to repeat infringers, AOL also: (1) changed the e-mail address to which infringement notifications were supposed to have been sent; and (2) failed to provide for forwarding of messages sent to the old address or notification that the e-mail address was inactive. *See Ellison*, 189 F.Supp.2d at 1057–58. AOL should have closed the old e-mail account or forwarded the e-mails sent to the old account to the new one. Instead, AOL allowed notices of potential copyright infringement to fall into a vacuum and to go unheeded; that fact is sufficient for a reasonable jury to conclude that AOL had not reasonably implemented its policy against repeat infringers.

### B. AOL and the Limitation of Liability Under § 512(a)

■ If after remand a jury finds AOL eligible under § 512(i) to assert OCILLA's safe harbor limitations of liability, the court need not revisit whether AOL qualifies for the limitation of liability provided by § 512(a).

The first safe harbor in OCILLA pertains to "transitory digital network com-

---

11. "Standard technical measures" refers to technical measures that copyright owners use to identify or to protect copyrighted works and: (1) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process; (2) are available to any person on reasonable and nondiscriminatory terms; and (3) do not impose substantial costs on service providers or substantial burdens on their systems or networks. 17 U.S.C. § 512(i)(2).

munications." 17 U.S.C. § 512(a). Under this section, a service provider would not be liable for copyright infringement:

by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections, if—

(1) the transmission of the material was initiated by or at the direction of a person other than the service provider;

(2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;

(3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;

(4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and

(5) the material is transmitted through the system or network without modification of its content.

*Id.* The definition of "service provider" for the purposes of the § 512(a) safe harbor limitation of liability is "an entity offering the transmission, routing, or providing of connections for digital online communica-

tions, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A).

Whether AOL functioned as a conduit service provider in this case presents pure questions of law: was the fourteen day period during which AOL stored and retained the infringing material "transient" and "intermediate" within the meaning of § 512(a)?; was "no ... copy ... maintained on the system or network ... for a longer period than is reasonably necessary for the transmission, routing, or provision of connections?" The district court appropriately answered these questions in the affirmative. In doing so, the court relied upon on the legislative history indicating that Congress intended the relevant language of § 512(a) to codify the result of *Netcom*, 907 F.Supp. at 1361 (provider that stored Usenet messages for 11 days not liable for direct infringement merely for "installing and maintaining a system whereby software automatically forwards messages received from subscribers onto the Usenet, and temporarily stores copies on its system"), and to extend it to claims for secondary liability. We affirm the district court's ruling that AOL is eligible for the safe harbor limitation of liability of § 512(a).[12]

### Conclusion

We conclude that the district court correctly identified triable issues of fact with respect to Ellison's claim against AOL for contributory copyright infringement. We also agree with the district court that Ellison's claim for vicarious copyright infringement fails; Ellison did not offer sufficient evidence that AOL received a direct

**12.** Because a jury has not found AOL liable for copyright infringement and eligible under § 512(i) for the safe harbor limitations of liability, we do not address (nor did the district court) whether AOL could successfully assert the safe harbor under § 512(c).

financial benefit from the infringement to survive summary judgment. Further, because we conclude that the district court failed to discern triable issues of fact concerning AOL's threshold eligibility under § 512(i) for the DMCA's safe harbor limitations of liability, we reverse the district court's judgment on this matter. If a jury determines that AOL is eligible for the DMCA's safe harbor limitations of liability under § 512(i), the parties do not need to relitigate whether AOL satisfies the requirements of § 512(a) in this case; we agree with the district court that it does.

In sum, we AFFIRM in part and REVERSE in part the district court's summary judgment in favor of AOL. We REMAND for trial on Ellison's claim of contributory copyright liability, and, if necessary, on AOL's eligibility under § 512(i) to assert the DMCA's safe harbor limitations of liability. Each party to bear its own costs.

**AFFIRMED in part, REVERSED in part, and REMANDED.**