METRO–GOLDWYN–MAYER STUDIOS, INC.; Columbia Pictures Industries, Inc.; Disney Enterprises, Inc.; Paramount Pictures Corporation; Twentieth Century Fox Film Corporation; Universal City Studios LLP, f/k/a Universal City Studios, Inc.; New Line Cinema Corporation; Time Warner Entertainment Company, LP; Atlantic Recording Corporation; Atlantic Rhino Ventures, Inc., d/b/a Rhino Entertainment, Inc.; Elektra Entertainment Group, Inc.; London–Sire Records, Inc., LP; Warner Brothers Records, Inc.; WEA International Inc.; Warner Music Latina, Inc., f/k/a WEA Latina, Inc.; Arista Records, Inc.; Bad Boy Records; Capitol Records, Inc.; Hollywood Records, Inc.; Interscope Records; Laface Records; Motown Record Company; RCA Records Label, a unit of BMG Music d/b/a BMG Entertainment; Sony Music Entertainment, Inc.; UMG Recordings, Inc.; Virgin Records America, Inc.; Walt Disney Records, a division of ABC, Inc.; Zomba Recording Corp., Plaintiffs–Appellants,

v.

GROKSTER LTD.; Streamcast Networks, Inc., f/k/a Musicc-ity.Com, Inc., Appellees,

and

Sharman Networks Limited; LEF Interactive PTY Ltd., Defendants.

Jerry Leiber, individually d/b/a Jerry Leiber Music; Mike Stoller, individually and d/b/a Mike Stolller Music; Peer International Corporation, Peer Music Ltd., Songs of Peer Ltd.; Criterion Music Corporation; Famous Music Corporation, Bruin Music Company; Ensign Music Corporation; and Let's Talk Shop, Inc., d/b/a Beau–DI–O–DO Music, on behalf of themselves and all other similarly situated, Plaintiffs–Appellants,

v.

Consumer Empowerment BV, aka Fast-track; Sharman Networks Limited; LEF Interactive PTY Ltd., Defendants,

and

Grokster Ltd.; Streamcast Networks, Inc., f/k/a Musiccity.Com, Inc., Defendants–Appellees.

Metro–Goldwyn–Mayer Studios, Inc.; Columbia Pictures Industries, Inc.; Disney Enterprises, Inc.; Paramount Pictures Corporation; Twentieth Century Fox Film Corporation; Universal City Studios LLP, f/k/a Universal City Studios, Inc.; New Line Cinema Corporation; Time Warner Entertainment Company, LP; Atlantic Recording Corporation; Atlantic Rhino Ventures, Inc., d/b/a Rhino Entertainment, Inc.; Elektra Entertainment Group, Inc.; London–Sire Records, Inc., LP; Warner Brothers Records, Inc.; WEA International Inc.; Warner Music Latina, Inc., f/k/a WEA Latina, Inc.; Arista Records, Inc.; Bad Boy Records; Capitol Records, Inc.; Hollywood Records, Inc.; Interscope Records; Laface Records; Motown Record Company; RCA Records Label, a unit of BMG Music d/b/a BMG Entertainment; Sony Music Entertainment, Inc.;

UMG Recordings, Inc.; Virgin Records America, Inc.; Walt Disney Records, a division of ABC, Inc.; Zomba Recording Corp., Plaintiffs–Appellants,

v.

Grokster Ltd.; Streamcast Networks, Inc., f/k/a Musiccity.Com, Inc., Defendants–Appellees.

Nos. 03–55894, 03–55901, 03–56236.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 2004.

Filed Aug. 19, 2004.

Russell J. Frackman (argued) and George M. Borkowski; Mitchell Silberberg, et al., LLP; Los Angeles, CA; for plaintiffs-appellants Metro–Goldwyn–Mayer Studios, Bad Boy Records, Capitol Records, Inc., Hollywood Records, Inc., Interscope Records, Laface Records, Motown Record Co., RCA Records Label, Sony Music Entertainment, Inc., UMG Recordings, Inc., Virgin Records America, Inc., Walt Disney Records, Inc., and Zomba Recording Corp.

Thomas G. Hentoff, David E. Kendall; Williams & Connolly; Washington, DC; for plaintiffs-appellants Metro–Goldwyn–Mayer Studios, Columbia Pictures Industries, Inc., Disney Enterprises, Inc., Paramount Pictures Corp., Twentieth Century Fox Film Corp., and Universal City Studios, LLP.

Robert M. Schwartz; O'Melveny & Myers, LLP; Los Angeles, CA, for Newline Cinema Corp., Time Warner Entertainment Co., Atlantic Recording Corp., Atlantic Rhino Ventures, Inc., Elektra Entertainment Group, Inc., London–Sire Records, Inc., LP, Warner Brothers Records, Inc., WEA International, Inc., Warner Music Latina, Inc., and Arista Records, Inc.

Kelli L. Sager, Andrew J. Thomas, and Jeffrey H. Blum; Davis, Wright, Tremaine, LLP, Los Angeles, CA; Carey R. Ramos (argued); Aidan Synnott and Theodore K. Cheng, Paul, Weiss, Rifkind, Wharton & Garrison, LLP; New York, NY, for plaintiffs-appellants Jerry Leiber, Mike Stoller, Peer International Corp., Peer Music Ltd., Songs of Peer Ltd., Criterion Music Corp., Famous Music Corp., Bruin Music Co., Ensign Music Corp., and Let's Talk Shop, Inc.

Mark Lemley and Michael H. Page (argued); Keker & Van Nest; San Francisco, CA; Jennifer Stisa Granick; Stanford Law School; Stanford, CA, for defendant-appellee Grokster Ltd.

Cindy A. Cohn and Fred von Lohmann (argued); Electronic Frontier Foundation; San Francisco, CA; Charles S. Baker; Munsch, Hardt, Kopf & Harr, P.C.; Austin, TX, for defendant-appellee Stream-Cast Networks, Inc.

Hank L. Goldsmith; Proskauer, Rose LLP; Los Angeles, CA, for amici Bureau International des Societes Gerant Les Droits D'enregistrement et de Reproduction Mecanique, et al.

John M. Genga; Paul, Hastings, Janofsky & Walker LLP; Los Angeles, CA, for amici Law Professors and Treatise Authors Neil Boorstyn, Jay Dougherty, James Gibson, Robert Gorman, Hugh Hansen, Douglas Lichtman, Roger Milgrim, Arthur Miller, and Eric Schwartz.

Ian C. Ballon; Manatt, Phelps & Phillips, LLP; Los Angeles, CA, for amici American Film Marketing Association, et al.

Jeff G. Knowles; Coblentz, Patch, Duffy & Bass; San Francisco, CA, for amici American Federation of Musicians, et al.

Alan Malasky; Porter, Wright, Morris & Arthur, LLP; Washington, DC, for amicus National Ass'n of Recording Merchandisers, Inc.

Matthew S. Steinberg; Greenberg Traurig, LLP; Santa Monica, CA, for amici National Academy of Recording Arts & Sciences, Inc.

Jennifer M. Urban; Samuelson Law, Technology and Public Policy Clinic, University of California at Berkeley School of Law; Berkeley, CA, for amici 40 Intellectual Property and Technology Law Professors.

Jason M. Mahler; Washington, DC, for amicus Computer & Communications Industry Association, Netcoalition Industry Association.

Christopher A. Hansen; ACLU Foundation; New York, NY, for amici American Civil Liberties Union, et al. Roderick G. Dorman; Hennigan, Bennett & Dorman, LLP; Los Angeles, California, David B. Casselman, Wasserman, Comden, Casselman & Pearson, LLP, Los Angeles, CA, for amicus Sharman Networks Ltd.

Robert E. Kohn, Santa Monica, CA, for amici Consumer Electronics Association and Home Recording Rights Coalition.

Before: BOOCHEVER, NOONAN, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

This appeal presents the question of whether distributors of peer-to-peer file-sharing computer networking software may be held contributorily or vicariously liable for copyright infringements by users. Under the circumstances presented by this case, we conclude that the defendants are not liable for contributory and vicarious copyright infringement and affirm the district court's partial grant of summary judgment.

## I. Background

From the advent of the player piano, every new means of reproducing sound has struck a dissonant chord with musical copyright owners, often resulting in federal litigation. This appeal is the latest reprise of that recurring conflict, and one of a continuing series of lawsuits between the recording industry and distributors of file-sharing computer software.

The plaintiffs in the consolidated cases ("Copyright Owners") are songwriters, music publishers, and motion picture studios who, by their own description, "own or control the vast majority of copyrighted motion pictures and sound recordings in the United States." [1] Defendants Grokster Ltd. and StreamCast Networks, Inc. ("Software Distributors") are companies that freely distribute software that allows users to share computer files with each other, including digitized music and motion pictures. The Copyright Owners allege that over 90% of the files exchanged through use of the "peer-to-peer" file-sharing software offered by the Software Distributors involves copyrighted material, 70% of which is owned by the Copyright Owners. Thus, the Copyright Owners argue, the Software Distributors are liable for vicarious and contributory copyright infringement pursuant to 17 U.S.C. §§ 501–13 (2000), for which the Copyright Owners are entitled to monetary and injunctive relief. The district court granted the Software Distributors partial summary judgment as to liability arising from present activities and certified the resolved questions for appeal pursuant to Fed. R.Civ.P. 54(b). *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 259 F.Supp.2d 1029 (C.D.Cal.2003) (*"Grokster I"*).

To analyze the legal issues properly, a rudimentary under-standing of the peer-to-peer file-sharing software at issue is required—particularly because peer-to-peer file sharing differs from typical internet use. In a routine internet transaction, a user will connect via the internet with a website to obtain information or transact business. In computer terms, the personal computer used by the consumer is considered the "client" and the computer that hosts the web page is the "server." The client is obtaining information from a centralized source, namely the server.

In a peer-to-peer distribution network, the information available for access does not reside on a central server. No one computer contains all of the information that is available to all of the users. Rather, each computer makes information available to every other computer in the peer-to-peer network. In other words, in a peer-to-peer network, each computer is both a server and a client.

Because the information is decentralized in a peer-to-peer network, the software must provide some method of cataloguing the available information so that users may access it. The software operates by connecting, via the internet, to other users of the same or similar software. At any given moment, the network consists of other users of similar or the same software online at that time. Thus, an index of files available for sharing is a critical component of peer-to-peer file-sharing networks.

At present, there are three different methods of indexing: (1) a centralized indexing system, maintaining a list of available files on one or more centralized servers; (2) a completely decentralized indexing system, in which each computer maintains a list of files available on that

---

**1.** The plaintiffs in the *Leiber* case represent a certified class of over 27,000 songwriters and music publishers. The plaintiffs in the *MGM* case include most of the major motion picture studios and recording companies.

computer only; and (3) a "supernode" system, in which a select number of computers act as indexing servers.[2]

The first Napster system employed a proprietary centralized indexing software architecture in which a collective index of available files was maintained on servers it owned and operated. A user who was seeking to obtain a digital copy of a recording would transmit a search request to the Napster server, the software would conduct a text search of the centralized index for matching files, and the search results would be transmitted to the requesting user. If the results showed that another Napster user was logged on to the Napster server and offering to share the requested recording, the requesting user could then connect directly with the offering user and download the music file.[3]

Under a decentralized index peer-to-peer file-sharing model, each user maintains an index of only those files that the user wishes to make available to other network users. Under this model, the software broadcasts a search request to all the computers on the network and a search of the individual index files is conducted, with the collective results routed back to the requesting computer. This

model is employed by the Gnutella software system and is the type of architecture now used by defendant StreamCast. Gnutella is open-source software, meaning that the source code is either in the public domain or is copyrighted and distributed under an open-source license that allows modification of the software, subject to some restrictions.

The third type of peer-to-peer file-sharing network at present is the "supernode" model, in which a number of select computers on the network are designated as indexing servers. The user initiating a file search connects with the most easily accessible supernode, which conducts the search of its index and supplies the user with the results. Any computer on the network could function as a supernode if it met the technical requirements, such as processing speed. The "supernode" architecture was developed by KaZaa BV, a Dutch company, and licensed under the name of "Fast-Track" technology.[4]

Both Grokster and StreamCast initially used the FastTrack technology. However, StreamCast had a licensing dispute with KaZaa, and now uses its own branded "Morpheus" version of the open-source Gnutella code. StreamCast users connect to other users of Gnutella-based peer-to-peer file-sharing software.[5] Both Grokster

---

2. This is an extremely simplistic overview of peer-to-peer file-sharing networks. There are a number of more complete descriptions available. *See, e.g.,* Yochai Benkler, *Coase's Penguin, or, Linux and* The Nature of the Firm, 112 Yale L.J. 369, 396–400 (2002); Jesse M. Feder, *Is Betamax Obsolete?: Sony Corp. of America v. Universal City Studios, Inc. in the Age of Napster,* 37 Creighton L.Rev. 859, 862–68 (2004).

3. A more complete description of the Napster system is contained in *A & M Records v. Napster,* 239 F.3d 1004, 1011–12 (9th Cir. 2001) (*"Napster I "*) and *A & M Records v. Napster,* 114 F.Supp.2d 896, 905–08 (N.D.Cal. 2000). The Napster system as described in this opinion and in the *Napster* cases is no longer being used by the company that purchased the Napster assets.

4. Since the litigation in this case began, control of the FastTrack software passed from KaZaa to Sharman Networks. KaZaa was named as a defendant in this action, but eventually ceased defending and default judgment was entered against it.

5. The owners of the FastTrack Software successfully prevented users of the StreamCast version of FastTrack from being able to connect to the Grokster and KaZaa users of FastTrack by using a software upgrade that was not sent to StreamCast users. Peer-to-peer file-sharing software upgrades can be coded in a way that prevents those who do not accept the upgrade from communicating with those who do, but those users who do not accept an upgrade may still be able to communicate with each other. The record indi-

and StreamCast distribute their separate softwares free of charge. Once downloaded onto a user's computer, the software enables the user to participate in the respective peer-to-peer file-sharing networks over the internet.[6]

Users of the software share digital audio, video, picture, and text files. Some of the files are copyrighted and shared without authorization, others are not copyrighted (such as public domain works), and still others are copyrighted, but the copyright owners have authorized software users in peer-to-peer file-sharing networks to distribute their work. The Copyright Owners assert, without serious contest by the Software Distributors, that the vast majority of the files are exchanged illegally in violation of copyright law.

## II. Analysis

The question of direct copyright infringement is not at issue in this case. Rather, the Copyright Owners contend that the Software Distributors are liable for the copyright infringement of the software users. The Copyright Owners rely on the two recognized theories of secondary copyright liability: contributory copyright infringement and vicarious copyright infringement. *Ellison v. Robertson,* 357 F.3d 1072, 1076(9th Cir.2004). We agree with the district court's well reasoned analysis that the Software Distributors' current activities do not give rise to liability under either theory.

## A. Contributory Copyright Infringement

■ The three elements required to prove a defendant liable under the theory of contributory copyright infringement are: (1) direct infringement by a primary infringer, (2) knowledge of the infringe-

ment, and (3) material contribution to the infringement. *Id.* The element of direct infringement is undisputed in this case.

### 1. Knowledge

Any examination of contributory copyright infringement must be guided by the seminal case of *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (*"Sony–Betamax"*). In *Sony–Betamax,* the Supreme Court held that the sale of video tape recorders could not give rise to contributory copyright infringement liability even though the defendant knew the machines were being used to commit infringement. In analyzing the contours of contributory copyright infringement, the Supreme Court drew on the "staple article of commerce" doctrine from patent law. *Id.* at 440–42. Under that doctrine, it would be sufficient to defeat a claim of contributory copyright infringement if the defendant showed that the product was "capable of substantial" or "commercially significant noninfringing uses." In applying this doctrine, the Court found that because Sony's Betamax video tape recorder was capable of commercially significant noninfringing uses, constructive knowledge of the infringing activity could not be imputed from the fact that Sony knew the recorders, as a general matter, could be used for infringement. *Id.* at 442.

In *Napster I,* we construed *Sony–Betamax* to apply to the knowledge element of contributory copyright infringement. *Napster I* held that if a defendant could show that its product was capable of substantial or commercially significant noninfringing uses, then constructive knowledge of the infringement could not be imputed.

---

cates this has already occurred, with a number of nonupgraded users still being able to communicate and share files with each other.

**6.** A more detailed description of each system is contained in the district court opinion in this case. *Grokster I,* 259 F.Supp.2d at 1031–33.

Rather, if substantial noninfringing use was shown, the copyright owner would be required to show that the defendant had reasonable knowledge of specific infringing files.[7] *Napster I*, 239 F.3d at 1027; *see also A & M Records v. Napster*, 284 F.3d 1091, 1095–96 (9th Cir.2002) ("*Napster II*").[8]

■ Thus, in order to analyze the required element of knowledge of infringement, we must first determine what level of knowledge to require. If the product at issue is not capable of substantial or commercially significant noninfringing uses, then the copyright owner need only show that the defendant had constructive knowledge of the infringement. On the other hand, if the product at issue *is* capable of substantial or commercially significant noninfringing uses, then the copyright owner must demonstrate that the defendant had reasonable knowledge of specific infringing files and failed to act on that knowledge to prevent infringement. *See Napster I*, 239 F.3d at 1027.

■ ■ In this case, the district court found it undisputed that the software distributed by each defendant was capable of substantial noninfringing uses. *Grokster I*, 259 F.Supp.2d at 1035. A careful examination of the record indicates that there is no genuine issue of material fact as to noninfringing use. Indeed, the Software Distributors submitted numerous declarations by persons who permit their work to be distributed via the software, or who use the software to distribute public domain works. *See id.* One striking example provided by the Software Distributors is the popular band Wilco, whose record company had declined to release one of its albums on the basis that it had no commercial potential. Wilco repurchased the work from the record company and made the album available for free downloading, both from its own website and through the software user networks. The result sparked widespread interest and, as a result, Wilco received another recording contract. Other recording artists have debuted their works through the user networks. Indeed, the record indicates that thousands of other musical groups have authorized free distribution of their music through the internet. In addition to music, the software has been used to share thousands of public domain literary works made available through Project Gutenberg as well as historic public domain films released by the Prelinger Archive. In short, from the evidence presented, the district court quite correctly concluded that the software was capable of substan-

7. In full, the test adopted in *Napster I* for defendants whose products are capable of substantial or commercially significant noninfringing uses is that "contributory liability may potentially be imposed only to the extent that the defendant (1) receives reasonable knowledge of specific infringing files . . .; (2) knows or should know that such files are available on the Napster system; and (3) fails to act to prevent viral distribution of the works." 239 F.3d at 1027. At this juncture, however, our focus is the standard of knowledge to be applied.

8. After *Napster I* was decided, the district court on remand required plaintiffs to give Napster notice of specific infringing files, and then required Napster to continually search its index and block all files containing the particular works at issue. *Napster II*, 284 F.3d at 1095–96. The plaintiffs appealed, arguing that "Napster should be required to search for and to block all files containing any protected copyrighted works, not just those works with which plaintiffs have been able to provide a corresponding file name." *Id.* at 1096. We found that the district court had not "committed any error of law or abused its discretion," *id.*, and that "[t]he notice requirement abide[d] by our holding that plaintiffs bear the burden to provide notice to Napster of copyrighted works and files containing such works available on the Napster system before Napster has the duty to disable access to the offending content." *Id.* (internal quotation marks omitted).

tial noninfringing uses and, therefore, that the *Sony–Betamax* doctrine applied.

The Copyright Owners submitted no evidence that could contradict these declarations. Rather, the Copyright Owners argue that the evidence establishes that the vast majority of the software use is for copyright infringement. This argument misapprehends the *Sony* standard as construed in *Napster I*, which emphasized that in order for limitations imposed by *Sony* to apply, a product need only be *capable* of substantial noninfringing uses. *Napster I*, 239 F.3d at 1021.[9]

In this case, the Software Distributors have not only shown that their products are capable of substantial noninfringing uses,[10] but that the uses have commercial viability. Thus, applying *Napster I, Napster II*, and *Sony–Betamax* to the record, the district court correctly concluded that the Software Distributors had established that their products were capable of substantial or commercially significant noninfringing uses. Therefore, the district correctly reasoned, the Software Distributors could not be held liable for constructive knowledge of infringement, and the Copyright Owners were required to show that the Software Distributors had reasonable knowledge of specific infringement to satisfy the threshold knowledge requirement.

Having determined that the "reasonable knowledge of specific infringement" requirement applies here, we must then decide whether the Copyright Owners have raised sufficient genuine issues of material fact to satisfy that higher standard. As the district court correctly concluded, the time at which such knowledge is obtained is significant. Because contributory copyright infringement requires knowledge *and* material contribution, the Copyright Owners were required to establish that the Software Distributors had "specific knowledge of infringement at a time at which they contribute[d] to the infringement, and [ ] fail[ed] to act upon that information." *Grokster I*, 259 F.Supp.2d at 1036 (citing *Napster I*, 239 F.3d at 1021). As the district court correctly observed, and as we explain further in our discussion of material contribution, "Plaintiffs' notices of infringing conduct are irrelevant," because "they arrive when Defendants do nothing to facilitate, and cannot do anything to stop, the alleged infringement" of specific copyrighted content. *Id.* at 1037. *See Napster II*, 284 F.3d at 1096 ("[P]laintiffs bear the burden to provide notice to Napster of copyrighted works and files containing such works available on the Napster system *before* Napster has the duty to disable access *to the offending content.*")

9. We are mindful that the Seventh Circuit has read *Sony's* substantial noninfringing use standard differently. *In re Aimster Copyright Litig.*, 334 F.3d 643, 651 (7th Cir.2003). It determined that an important additional factor is how "probable" the noninfringing uses of a product are. *Id.* at 653. The Copyright Owners urge us to adopt the *Aimster* rationale. However, *Aimster* is premised specifically on a fundamental disagreement with *Napster I's* reading of *Sony–Betamax*. We are not free to reject our own Circuit's binding precedent. *See Montana v. Johnson*, 738 F.2d 1074, 1077 (9th Cir.1984) (holding that only this court sitting en banc may overrule a prior decision by this court). Even if we were free to do so, we do not read *Sony–Betamax's*

holding as narrowly as does the Seventh Circuit. Regardless, it is not clear that application of the *Aimster* rationale would assist the Copyright Owners here. Implicit in the *Aimster* analysis is that a finding of substantial noninfringing use, including potential use, would be fatal to a contributory infringement claim, regardless of the level of knowledge possessed by the defendant. In *Aimster*, no evidence was tendered of any noninfringing product use.

10. Indeed, even at a 10% level of legitimate use, as contended by the Copyright Owners, the volume of use would indicate a minimum of hundreds of thousands of legitimate file exchanges.

(internal quotation marks omitted) (emphasis added).

■ In the context of this case, the software design is of great import. As we have discussed, the software at issue in *Napster I* and *Napster II* employed a centralized set of servers that maintained an index of available files. In contrast, under both StreamCast's decentralized, Gnutella-type network and Grokster's quasi-decentralized, supernode, KaZaa-type network, no central index is maintained. Indeed, at present, neither StreamCast nor Grokster maintains control over index files. As the district court observed, even if the Software Distributors "closed their doors and deactivated all computers within their control, users of their products could continue sharing files with little or no interruption." *Grokster I*, 259 F.Supp.2d at 1041.

Therefore, we agree with the district court that the Software Distributors were entitled to partial summary judgment on the element of knowledge.

### 2. Material Contribution

■ We also agree with the district court that with respect to their current software distribution and related activities, defendants do not materially contribute to copyright infringement.

In *Napster I*, we found material contribution after reciting the district court's factual finding that "Napster is an integrated service." 239 F.3d at 1022. We "agree[d] that Napster provides the site and facilities for direct infringement." *Id.* (internal quotation marks omitted). We further cited the holding of *Netcom*, which found "substantial participation" based on Netcom's "failure to cancel [a user's] infringing message and thereby stop an infringing copy from being distributed worldwide." *Id.* (quoting *Religious Tech. Ctr. v. Netcom On–Line Communication Servs.*, 907 F.Supp. 1361, 1372 (N.D.Cal. 1995)) (alteration in original). We have

also found material contribution where a defendant operated a swap meet at which infringing products were sold and provided utilities, parking, and advertising. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261, 264 (9th Cir.1996).

As indicated by the record, the Software Distributors do not provide the "site and facilities" for infringement, and do not otherwise materially contribute to direct infringement. Infringing messages or file indices do not reside on defendants' computers, nor do defendants have the ability to suspend user accounts. *Grokster I*, 259 F.Supp.2d at 1037, 1039–41.

While material contribution can be established through provision of site and facilities for infringement, followed by a failure to stop specific instances of infringement once knowledge of those infringements is acquired, the Software Distributors have not provided the site and facilities for infringement in the first place. If the Software Distributors were true access providers, failure to disable that access after acquiring specific knowledge of a user's infringement might be material contribution. *Netcom*, 907 F.Supp. at 1375. Or, if the Software Distributors stored files or indices, failure to delete the offending files or offending index listings might be material contribution. *Napster I*, 239 F.3d at 1022. However, the Software Distributors here are not access providers, and they do not provide file storage and index maintenance. Rather, it is the users of the software who, by connecting to each other over the internet, create the network and provide the access. "Failure" to alter software located on another's computer is simply not akin to the failure to delete a filename from one's own computer, to the failure to cancel the registration name and password of a particular user from one's user

list, or to the failure to make modifications to software on one's own computer.

The Copyright Owners have not provided evidence that defendants materially contribute in any other manner. StreamCast maintains an XML[11] file from which user software periodically retrieves parameters. These values may include the addresses of websites where lists of active users are maintained. The owner of the FastTrack software, Sharman, maintains root nodes containing lists of currently active supernodes to which users can connect. Both defendants also communicate with users incidentally, but not to facilitate infringement. All of these activities are too incidental to any direct copyright infringement to constitute material contribution. No infringing files or lists of infringing files are hosted by defendants, and the defendants do not regulate or provide access.

While Grokster and StreamCast in particular may seek to be the "next Napster," *Grokster I,* 259 F.Supp.2d at 1036, the peer-to-peer file-sharing technology at issue is not simply a tool engineered to get around the holdings of *Napster I* and *Napster II.* The technology has numerous other uses, significantly reducing the distribution costs of public domain and permissively shared art and speech, as well as reducing the centralized control of that distribution. Especially in light of the fact that liability for contributory copyright infringement does not require proof of any direct financial gain from the infringement, we decline to expand contributory copyright liability in the manner that the Copyright Owners request.

### B. Vicarious Copyright Infringement

 Three elements are required to prove a defendant vicariously liable for copyright infringement: (1) direct infringement by a primary party, (2) a direct financial benefit to the defendant, and (3) the right and ability to supervise the infringers. *Napster I,* 239 F.3d at 1022. "Vicarious copyright liability is an 'outgrowth' of respondeat superior," imposing liability on those with a sufficiently supervisory relationship to the direct infringer. *Id.* (citing *Cherry Auction,* 76 F.3d at 262). In *Napster I,* we held that *Sony–Betamax* "has no application to ... vicarious copyright infringement" because the issue of vicarious liability was "not before the Supreme Court" in that case. *Id.*

The elements of direct infringement and a direct financial benefit, via advertising revenue, are undisputed in this case.

### 1. Right and Ability To Supervise

 We agree with the district court that there is no issue of material fact as to whether defendants have the right and ability to supervise the direct infringers in this case. Allocation of liability in vicarious copyright liability cases has developed from a historical distinction between the paradigmatic "dance hall operator" and "landlord" defendants. *Cherry Auction,* 76 F.3d at 262. The dance hall operator is liable, while the landlord escapes liability, because the dance hall operator has the right and ability to supervise infringing conduct while the landlord does not. *Id.* Thus, the "right and ability to supervise" describes a relationship between the defendant and the direct infringer.

A salient characteristic of that relationship often, though not always, is a formal licensing agreement between the defendant and the direct infringer. *See, e.g., Napster I,* 239 F.3d at 1023; *Cherry Auction,* 76 F.3d at 261; *Shapiro, Bernstein &*

---

**11.** XML is an abbreviation for Extensible Markup Language. A markup language the reader may be more familiar with is HTML, which stands for HyperText Markup Language.

*Co. v. H.L. Green Co.,* 316 F.2d 304, 306 (2d Cir.1963) (cited as the landmark case in *Cherry Auction,* 76 F.3d at 262). Indeed, *Napster I* found especially important the fact that Napster had an express policy reserving the right to block infringers' access for any reason. 239 F.3d at 1023 ("[A]bility to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise.").

In *Cherry Auction,* we held that the right and ability to supervise existed where a swap meet operator reserved the right to terminate vendors for any reason, promoted the swap meet, controlled access by customers, patrolled the meet, and could control direct infringers through its rules and regulations. 76 F.3d at 262–63. Similarly in *Napster I,* we found Napster had the right and ability to supervise Napster users because it controlled the central indices of files, users were required to register with Napster, and access to the system depended on the validity of a user's registration. 239 F.3d at 1011–12, 1023–24.

It does not appear from any of the evidence in the record that either of the defendants has the ability to block access to individual users. Grokster nominally reserves the right to terminate access, while StreamCast does not maintain a licensing agreement with persons who download Morpheus. However, given the lack of a registration and log-in process, even Grokster has no ability to actually terminate access to filesharing functions, absent a mandatory software upgrade to all users that the particular user refuses, or IP address-blocking attempts.[12] It is also clear that none of the communication between defendants and users provides a point of access for filtering or searching for infringing files, since infringing material and index information do not pass through defendants' computers.

In the case of StreamCast, shutting down its XML file altogether would not prevent anyone from using the Gnutella network. In the case of Grokster, its licensing agreement with KaZaa/Sharman does not give it the ability to mandate that root nodes be shut down. Moreover, the alleged ability to shut down operations altogether is more akin to the ability to close down an entire swap meet or stop distributing software altogether, rather than the ability to exclude individual participants, a practice of policing aisles, an ability to block individual users directly at the point of log-in, or an ability to delete individual filenames from one's own computer. *See Napster I,* 239 F.3d at 1023–24; *Cherry Auction,* 76 F.3d at 261–62. The sort of monitoring and supervisory relationship that has supported vicarious liability in the past is completely absent in this case.

The district court here found that unlike Napster, Grokster and StreamCast do not operate and design an "integrated service," *Grokster I,* 259 F.Supp.2d at 1045, which they monitor and control. We agree. The nature of the relationship between Grokster and StreamCast and their users is significantly different from the nature of the relationship between a swap meet operator and its participants, or prior versions of Napster and its users, since Grokster and StreamCast are more truly decentralized, peer-to-peer file-sharing networks.

■ The district court correctly characterized the Copyright Owners' evidence of the right and ability to supervise as little more than a contention that "the software

---

12. IP address-blocking will not be effective against a user who, like most persons, does not have a permanent IP address, but is rath-er assigned one each time he connects to the Internet.

itself could be altered to prevent users from sharing copyrighted files." *Grokster I*, 259 F.Supp.2d at 1045. In arguing that this ability constitutes evidence of the right and ability to supervise, the Copyright Owners confuse the right and ability to supervise with the strong duty imposed on entities that have already been determined to be liable for vicarious copyright infringement; such entities have an obligation to exercise their policing powers to the fullest extent, which in Napster's case included implementation of new filtering mechanisms. *Napster II*, 284 F.3d at 1098 ("The tolerance standard announced *applies only to copyrighted works which Plaintiffs have properly noticed* as required by the modified preliminary injunction. That is, Napster must do everything feasible to block files from its system which contain noticed copyrighted works.") (emphasis added). But the potential duty a district court may place on a vicariously liable defendant is not the same as the "ability" contemplated by the "right and ability to supervise" test. Moreover, a duty to alter software and files located on one's own computer system is quite different in kind from a duty to alter software located on another person's computer. We agree with the district court that possibilities for upgrading software located on another person's computer are irrelevant to determining whether vicarious liability exists. *Grokster I*, 259 F.Supp.2d at 1045; *see also Napster I*, 239 F.3d at 1024 ("Napster's reserved 'right and ability' to police is cabined by the system's current architecture.").

### C. Turning a "Blind Eye" to Infringement

■ The Copyright Owners finally argue that Grokster and StreamCast should not be able to escape vicarious liability by turning a "blind eye" to the infringement of their users, and that "[t]urning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability." *Napster I*, 239 F.3d at 1023. If the Software Distributors had a right and ability to control and supervise that they proactively refused to exercise, such refusal would not absolve them of liability. *See id.* However, although that rhetoric has occasionally been employed in describing vicarious copyright infringement, there is no separate "blind eye" theory or element of vicarious liability that exists independently of the traditional elements of liability. Thus, this theory is subsumed into the Copyright Owners' claim for vicarious copyright infringement and necessarily fails for the same reasons.

### III.

Resolution of these issues does not end the case. As the district court clearly stated, its decision was limited to the specific software in use at the time of the district court decision. The Copyright Owners have also sought relief based on previous versions of the software, which contain significant—and perhaps crucial—differences from the software at issue. We express no opinion as to those issues.

As to the question at hand, the district court's grant of partial summary judgment to the Software Distributors is clearly dictated by applicable precedent. The Copyright Owners urge a re-examination of the law in the light of what they believe to be proper public policy, expanding exponentially the reach of the doctrines of contributory and vicarious copyright infringement. Not only would such a renovation conflict with binding precedent, it would be unwise. Doubtless, taking that step would satisfy the Copyright Owners' immediate economic aims. However, it would also alter general copyright law in profound ways with unknown ultimate consequences outside the present context.

Further, as we have observed, we live in a quicksilver technological environment with courts ill-suited to fix the flow of internet innovation. *AT & T Corp. v. City of Portland,* 216 F.3d 871, 876 (9th Cir. 1999). The introduction of new technology is always disruptive to old markets, and particularly to those copyright owners whose works are sold through well-established distribution mechanisms. Yet, history has shown that time and market forces often provide equilibrium in balancing interests, whether the new technology be a player piano, a copier, a tape recorder, a video recorder, a personal computer, a karaoke machine, or an MP3 player. Thus, it is prudent for courts to exercise caution before restructuring liability theories for the purpose of addressing specific market abuses, despite their apparent present magnitude.

Indeed, the Supreme Court has admonished us to leave such matters to Congress. In *Sony–Betamax,* the Court spoke quite clearly about the role of Congress in applying copyright law to new technologies. As the Supreme Court stated in that case, "The direction of Art. I is that *Congress* shall have the power to promote the progress of science and the useful arts. When, as here, the Constitution is permissive, the sign of how far Congress has chosen to go can come only from Congress." 464 U.S. at 456, 104 S.Ct. 774 (quoting *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 530, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972)).

In this case, the district court correctly applied applicable law and properly declined the invitation to alter it. We affirm the district court, and remand for resolution of the remaining issues.

**AFFIRMED.**